## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH D.G. SIMPSON, FREDERICK MERKERSON, MAURICE RICHARDSON, and JONATHAN HARRIS, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Case No. 18-cv-_____ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| COOK COUNTY SHERIFF'S OFFICE, COOK COUNTY SHERIFF'S MERIT BOARD, and COUNTY OF COOK, | ) ) ) ) | |
| Defendants. | ) ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Joseph D.G. Simpson, Frederick Merkerson, Maurice Richardson, and Jonathan Harris, on behalf of themselves and all others similarly situated, complain as follows against Defendants the Cook County Sheriff's Office (the "CCSO"), the Cook County Sheriff's Merit Board ("Merit Board"), and the County of Cook ("the County"):

## NATURE OF THE CASE

1.      This is a class action complaint brought to remedy race discrimination in employment against African Americans applying to be Correctional Officers at the Cook County Department of Corrections—in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*; Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981; the Illinois Civil Rights Act, 740 ILCS 23/5(a)(1); and the Equal Protection Clause of the United States Constitution.

2.     Plaintiffs seek to certify a class of all African Americans who applied for employment as Correctional Officers at the Cook County Department of Corrections and whose applications were rejected after January 23, 2014.

3.     For decades, a substantial proportion—often exceeding a majority—of the sworn sheriff deputies employed as Correctional Officers at the Cook County Department of Corrections have been African American. Public sector employment has historically been an important source of employment for African Americans. See http://laborcenter.berkeley.edu/pdf/2011/blacks_public_sector11.pdf. These employment patterns have held true in Cook County, where African Americans make up approximately 25% of the workforce but hold a higher percentage of public sector jobs, including as Cook County Correctional Officers.

4.     Despite the historic availability of these positions to qualified African Americans, since at least 2013, there has been a substantial drop off in the number and percentage of African Americans hired as Correctional Officers in Cook County.

5.     According to the CCSO's own EEO-1 data for fiscal year 2015, the CCSO hired 251 protective service officers—but only 42 of those new officers were African American.

6.     And according to additional data provided to the Equal Employment Opportunity Commission ("EEOC") in its investigation of the charges of racial discrimination filed by the Plaintiffs in this case: (a) the CCSO's November 16, 2015 Correctional Officer class had only four African Americans in a class of 47 new hires (8.5%); (b) the January 25, 2016 class had only seven African Americans in a class

2

of 52 new hires (13.5%); and (c) the April 18, 2016 class had only five African Americans in a class of 39 new hires (12.8%).

7.      In almost all training classes conducted between 2013 and 2017, African Americans have been significantly underrepresented. The CCSO hired 18 classes of new Officers between January 2013 and August 2015. In response to a FOIA request, the CCSO generated a list of "Blacks" hired in these classes, which averaged around 50 new Correctional Officers each. The CCSO identified the number of blacks hired into each of those classes as follows:

| Class | Black Hires Per CCSO |
|---|---|
| Jan. 2013 | 14 |
| April 2013 | 9 |
| June 2013 | 7 |
| Aug. 2013 | 7 |
| Sept. 2013 | 9 |
| Nov. 2013 | 7 |
| Dec. 2013 | 5 |
| Feb. 2014 | 11 |
| Mar. 2014 | 9 |
| Apr. 2014 | 10 |
| June 2, 2014 | 8 |
| June 30, 2014 | 6 |
| Aug. 2014 | 2 |
| Sept. 2014 | 8 |
| Nov.  2014 | 11 |
| Apr. 2015 | 8 |
| June 2015 | 7 |
| Aug. 2015 | 12 |

Total:        150

8.      The numbers in the table above, although evidencing the underrepresentation of African Americans, actually understate the problem. At

3

least 24 of the 150 persons hired that the CCSO reported as "Black" in its FOIA response are actually white or Hispanic.

9.　　There is no legitimate, non-discriminatory explanation for the drop off in African American hires, compared to white hires.

10.　　Since 2013 at least, Defendants' selection and screening criteria for hiring have not been job related or reliable and have had an adverse impact on African Americans. The invalidity and unreliability of the process are reflected in the experience of a named Plaintiff and class members who were rejected for employment until the Plaintiffs in this case filed EEOC charges and the CCSO "reconsidered" some previously rejected applicants and hired them.

11.　　On information and belief, the Defendants have intentionally discriminated against black applicants. The numbers—the stark decrease in African Americans hired after 2013—for which the Defendants provided the EEOC no explanation, are prima facie evidence of that. Likewise, the remarks made to applicants by Defendants' agents during the hiring process—for example, to Plaintiff Merkerson that he could expect to be "fuck[ed] over, because they're not hiring black folks" or to a class member that "it seems to me all Cook County wants to do is hire white boys"—are probative of intentional discrimination. And so is the fact that, as the EEOC also discovered, applicants' files are color-coded. Each applicant file includes both a photograph of the applicant and other indicia of their racial background—an invitation to discriminate. Until Plaintiffs filed EEOC charges, the CCSO Bureau of Human Resources apparently kept African American

files separated from others—or so African Americans currently employed as Correctional Officers have been informed.

12.     Since 2013 at least, the disproportionate rejection of African American applicants in the hiring process has been so well-settled and pervasive as to constitute the de facto equivalent of a formal policy of excluding African Americans because of their race.

13.     Unless enjoined by this Court, the Defendants will continue to discriminate against African Americans applying to be Correctional Officers for the CCSO and Cook County.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 29 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). The acts that gave rise to the claims alleged in this Complaint occurred in Illinois and in this District.

## PARTIES

16.     Plaintiff Joseph D.G. Simpson, an African American, submitted four applications to the Merit Board for the position of Correctional Officer, in 2014, 2015, and 2017. Each time, he was rejected for employment.

17.     Plaintiff Frederick Merkerson, an African American, submitted an application to the Merit Board for the position of Correctional Officer in 2015 and was rejected for employment in October 2015.

18.     Plaintiff Maurice Richardson, an African American, submitted three applications to the Merit Board for the position of Correctional Officer in late 2014 (or early 2015), in 2015, and in 2017. He was rejected for employment twice in 2015. After he filed his EEOC charge, and while his 2017 application was pending, the CCSO contacted him and said they were "reconsidering" him and then hired him into the June 2017 training class.

19.     Plaintiff Jonathan Harris, an African American, submitted an application to the Merit Board for the position of Correctional Officer in 2014 and was rejected for employment on March 20, 2015.

20.     Defendant County of Cook ("Cook County" or "the County") is a body politic and corporate, organized under Illinois' County Code, 55 ILCS 5/1-1001 *et seq*. The County employs Correctional Officers at the Cook County Department of Corrections ("Jail"). Operational responsibilities for the Jail are shared between the County and the CCSO.

21.     The County is a necessary party to this complaint, by virtue of its responsibility to indemnify the CCSO and the Merit Board for monetary amounts recovered by the Plaintiffs through this action. *Carver v. Sheriff of La Salle County*, 324 F.3d 947 (7th Cir. 2003).

22.     Defendant Cook County Sheriff's Office (the CCSO) is a unit of local government, organized under 55 ILCS 5/3-6001–6036. At all times relevant, the CCSO has been a signatory (or joint signatory, along with the County) to collective bargaining agreements governing the employment of Correctional Officers at the Cook County Jail.

23.     Defendant Cook County Sheriff's Merit Board is an administrative body that obtains its power by virtue of statute, 55 Ill. Comp. Stat. 5/3-7002, with a board of seven to nine members appointed by the Sheriff, subject to approval by the county board. The Merit Board's purpose is to create employment policies and make employment decisions for the CCSO and shares authority with the CCSO for hiring decisions. The Merit Board is the final policymaker for the CCSO on decisions not to certify applicants as "eligible for hire" by the CCSO and the County.

## FACTUAL ALLEGATIONS

### Plaintiff Simpson

24.     Plaintiff Joseph D.G. Simpson applied to be a Correctional Officer at the Department of Corrections four times from 2014 to 2017. His father is a sworn deputy sheriff and has been employed as a Correctional Officer at the Jail since 1991. His grandfather was also a Correctional Officer who retired from the position around 1993 after many years of service. Plaintiff Simpson's most recent rejection was in 2018. After submitting his 2015 application, he passed the written examination, the situation test, the physical examination, and a rigorous

background check and was certified for employment by the Merit Board. Yet despite Merit Board certification, the CCSO rejected him for employment.

25.     The deputy sheriff assigned to the background investigation on Simpson's 2015 application, named "Smith," told him that there was "no reason not to hire him" and that he would "hire him right now if he could." After Merit Board certification, he was subjected to racially charged questioning before and during the polygraph exam. After assuring the polygraph examiner that he had no gang affiliations and that his father, a Correctional Officer, keeps him on the right track, the examiner asked, "Well, if you had to pick a gang, which one would you pick?" Upon information and belief, this examiner did not ask white applicants who denied gang affiliations which gang "they would pick."

26.     Plaintiff Simpson was and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Merkerson**

27.     Plaintiff Frederick Merkerson applied to be a Correctional Officer at the Department of Corrections in June or July 2015, after his honorable discharge as a Specialist in the United States Army. From 2010-2014, he spent four years on active duty with the Army, including a one-year deployment in Afghanistan.

28.     After submitting his application to the Merit Board, he took and passed the written examination, situation test, physical fitness test, and a drug test. After completing the exhaustive background questionnaire, he turned it in to

8

an employee at the Cook County Administration Building. The employee flipped through the questionnaire and told him that he needed to explain his answer to a question about child support payments. The employee handed him a paper and pen, and Merkerson wrote the explanation, as directed.

29. A short time later, the assigned background investigator, a deputy sheriff named "Woods" called him in for an interview. At the interview, Woods told Merkerson that the Merit Board might frown upon the handwritten explanation about the child support payments. He said that they could use it just to "fuck with [him]," and that they would try to "fuck [him] over, because they're not hiring black folks." He instructed Merkerson to send the explanation in an email instead, which Merkerson did. A few days later, the investigator called and told him that he was pushing his application through to the Merit Board and recommending that he get the position. The investigator made the same statement to one of Merkerson's references, when he called to do the reference check.

30. The references in support of Merkerson's application included a U.S. Army captain (now an Army major), an Army sergeant, and an Army staff sergeant—all of whom vouched for Merkerson's character.

31. Despite his military service in Afghanistan, the recommendation of the CCSO investigator, and the endorsement of three U.S. Army officers, the Merit Board refused to certify Merkerson as eligible for hire as a Correctional Officer. He received a Notification of Disqualification from the Merit Board on October 27, 2015.

32.     On January 8, 2016, Merkerson filed a class action charge of discrimination with the EEOC, alleging race discrimination in the hiring process for Cook County Correctional Officers. His complaint has been to no avail. Although the CCSO "reopened" or "reconsidered" the applications of certain African American applicants after the Plaintiffs filed EEOC charges, they did not offer to hire Merkerson. Merkerson received notification from the EEOC of his right to file this case and has done so within 90 days of his receipt of that notice.

33.     Merkerson was and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Richardson**

34.     Plaintiff Maurice Richardson applied to be a Correctional Officer in late 2014 or early 2015, in 2015, and in 2017. On the second application, he passed the written test, situation test, and physical fitness test. Deputy Sheriff Fontella Brown-Marshall was assigned to his background investigation and recommended him for hire. The Merit Board certified him as eligible for hire on September 24, 2015.

35.     After Merit Board certification, he was required to take a polygraph test. The examiner was an older white male, believed to be Edward Fisher, who asked multiple racially charged questions both before and during the administration of the polygraph test. For example, he said he "knew" that Richardson "must have" sold drugs and "must have" been in a gang because he grew

up in the Robert Taylor Homes, a public housing project. He repeatedly accused Richardson of "lying" or "concealing things," although he had no non-discriminatory basis to believe that he was lying about his background.

36.    On November 4, 2015, the CCSO Bureau of Human Services sent Richardson a letter rejecting his employment application.

37.    After receiving notice of his rejection, he contacted Brown-Marshall to inform her of the rejection and to report the polygraph examiner's discriminatory conduct. She suggested that he write a letter to the Merit Board about how he was treated—which he did.

38.    On November 25, 2015, Richardson wrote the letter, directing it to James P. Nally, Chairman of the Merit Board. He explained that the polygraph examiner had created an "offensive and uncomfortable environment," that the hiring process was not "fair and just," and asking that his application be "reviewed and reevaluated." On December 16, 2015, Richardson received an email from Rosemarie Nolan, Executive Director of the Merit Board, stating that the letter would be "forwarded to the Cook County Sheriff's Bureau of Human Resources" and that additional questions should be directed to Robert Egan, CCSO's Compliance Officer. Richardson's complaint was to no avail. At best, he spoke to Mr. Egan, who told him that the CCSO had done nothing improper.

39.    On January 19, 2016, Richardson filed a class action charge of discrimination with the EEOC, alleging race discrimination in the hiring process for

11

Cook County Correctional Officers. He subsequently received notification of his right to file this case and has done so within 90 days of his receipt of that notice.

40.     In 2017, after filing the EEOC charge, Richardson reapplied to the Merit Board for the Correctional Officer position. While that application was pending, the CCSO contacted him in reference to the 2015 application and asked whether he still wanted the job, because his application was being "reconsidered." Richardson was hired into the June 2017 training class, graduated in November 2017, and is currently employed as a Correctional Officer in Division 4 of the Jail.

41.     Richardson was at all times fully qualified to work as a Correctional Officer for the CCSO and the County but was denied employment until June 2017 because of Defendants' racially discriminatory hiring practices. His current employment as a Correctional Officer at the Jail demonstrates that Defendants had no legitimate, non-discriminatory reason to reject his employment applications. Instead, he was repeatedly denied employment because of his race.

**Plaintiff Harris**

42.     Plaintiff Jonathan Harris applied to be a Correctional Officer at the Department of Corrections in or around June 2014. He took and passed the written examination, the situation test, the physical fitness test, and a drug test and completed the exhaustive background questionnaire. The investigator assigned to conduct his background check, believed to be Don Jeffries, told him that the CCSO was very "short-staffed" and that he should expect to work a great deal of overtime after he was hired.

43.     On February 10, 2015, the Merit Board certified Harris as eligible for appointment as a Correctional Officer.

44.     In March 2015, he took a polygraph test, and after completing the test, the examiner told him that he had done "really well," that he had been "really honest," and that he was in "good shape." At the end of the conversation, he congratulated him and said that he hoped to see him around soon. In fact, a training class was scheduled to start about two weeks later.

45.     On March 20, 2015, despite certification by the Merit Board and the positive comments by the polygraph examiner, the CCSO sent Harris a letter rejecting his employment application.

46.     On or around January 15, 2016, Harris filed a class action charge of discrimination with the EEOC, alleging race discrimination in the hiring process for Cook County Correctional Officers. Although the CCSO "reopened" or "reconsidered" the applications of certain African American applicants after the Plaintiffs filed EEOC charges, they did not offer to hire Harris. Harris has received notification from the EEOC of his right to file this case and has done so within 90 days of his receipt of that notice.

47.     Harris was at all times and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Defendants' Policies and Practices of Racial**
**Discrimination In Hiring Correctional Officers**

48.  To be hired as a Cook County Correctional Officer, applicants must (a) apply to the Merit Board, (b) be certified by the Merit Board as "eligible for hire," and (c) receive an offer from the CCSO Bureau of Human Resources.

### A. Merit Board Certification

49.  After submitting an application to the Merit Board, each applicant must pass a written examination, a "situation" or "scenario" examination, and a physical fitness test. Applicants who successfully complete each of these steps are fingerprinted, drug tested, and interviewed by a Merit Board investigator. (The investigators are hired by the CCSO and on the County payroll.)

50.  Applicants must then submit to a rigorous background investigation, which includes completing a 20-page personal history form, submitting documentation, and being interviewed again by a Merit Board investigator. The investigator then authors a report and the entire file is sent to the Merit Board, which decides whether to "certify" the candidate as "eligible for hire." If the Merit Board denies certification, the applicant is disqualified without further consideration.

51.  Each applicant file includes a photograph, the applicant's residence address, and the criminal background check. The photographs reveal each applicant's appearance. The background check discloses the applicant's race. In addition, due to Chicago's extreme racial segregation,

(https://www.metroplanning.org/uploads/cms/documents/cost-of-segregation.pdf),

14

the residence address may strongly correlate with race, and conjure stereotypes about individuals who reside in minority communities with high crime rates.

52.     Applicants are not permitted to appear before the Merit Board. Merit Board members sit in a room together and review the files, which include multiple indicia of the applicant's race. Before an applicant moves forward, a majority of the Merit Board members must agree.

53.     Nearly all Merit Board members are white. During most or all of the relevant period, Byron Brazier was the only African American member of the Merit Board. Not all Merit Board members are present for the review of each file. On information and belief, Reverend Brazier was not always present. Thus, the Merit Board reviewed—and rejected—the applications of many class members without the input of even one African American member.

54.     The Merit Board review process invites racial stereotyping and discrimination. There are few if any objective or standardized criteria.

55.     During the EEOC investigation of Plaintiffs' discrimination charges, the investigator asked the Merit Board and the CCSO to provide data on the racial composition of the applicant pool. They did not provide it, even though the information is readily ascertainable from the applicant files.

56.     From 2013 to 2017, a disproportionate percentage of African American applicants "washed out" during the Merit Board certification process. In other words, the percentage of African Americans applying to be Correctional Officers was higher than the percentage certified by the Merit Board. Because the CCSO and the

Merit Board failed to provide applicant data to the EEOC, this allegation is made on information and belief.

57.     On information and belief, the Merit Board has also intentionally discriminated against Plaintiffs and class members on the basis of race.

## B. Hiring Decisions by the CCSO Bureau of Human Resources

58.     Applicants are not guaranteed hire after Merit Board certification. The Merit Board sends certified applications to the CCSO Bureau of Human Resources, which makes the final hiring decisions.

59.     Before final review by the Bureau of Human Resources, applicants are subjected to a polygraph examination.

60.     During the relevant period, at least one CCSO polygraph examiner expressed racial bias towards African Americans. Examples include insisting that Plaintiff Richardson "must have" sold drugs and "must have" joined a gang because he grew up in the Robert Taylor Homes and asking Plaintiff Simpson, who denied any gang affiliation and said that his father was a Correctional Officer, which gang he would "pick."

61.     The CCSO's review process is not "color blind." The race of each applicant is clearly indicated. The files include a photograph and other indicia of race, including residence address.

62.     The CCSO's hiring criteria are unreliable and subjective. The process invites racial stereotyping and discrimination.

63.     The Bureau of Human Resources selection process has an adverse impact on African Americans. African American applicants "wash out" at a higher rate than white applicants. Because the CCSO failed to provide applicant data to the EEOC, this allegation is made on information and belief.

64.     On information and belief, the CCSO Bureau of Human Resources also intentionally discriminated against Plaintiffs and class members on the basis of race.

## C. The Discriminatory Results of the CCSO's Hiring Process

65.     The CCSO has hired more than five hundred Correctional Officers since 2014. Despite the racial diversity of the applicant pool, the vast majority of the new hires are either white or Hispanic.

66.     During the period 2014 to 2017, African Americans were substantially underrepresented in every Correctional Officer training class.

67.     According to data provided to the EEOC during its investigation of Plaintiffs' discrimination charges:

      a.  Of 47 new hires in the November 16, 2015 Correctional Officer class, only four were African American—a rate of just 8.5%.

      b.  Of 52 new hires in the January 25, 2016 Correctional Officer class, only seven were African American—a rate of just 13.5%.

      c.  Of 39 new hires in the April 18, 2016 Correctional Officer class, only five were African American—a rate of just 12.8%.

68.     The exact number and percentage of African Americans in the applicant pool is not currently known to Plaintiffs. However, named Plaintiffs and class members observed that African Americans made up as many as 60 to 70% of those present for physical fitness testing.

69.     On information and belief, the selection rate of African Americans was far lower—much less than 80%—of the selection rate of white applicants for the 2014 to 2017 Correctional Officer classes. Defendants' hiring practices had an adverse impact on African American applicants.

70.     Defendants' selection procedures for the Correctional Officer position after the point of physical fitness testing create adverse impact, are unreliable, and have never been validated through a demonstration of a demonstrable relationship to job performance, and lesser discriminatory alternatives with the same or greater validity are available. There is no empirical data demonstrating that these procedures are predictive of or significantly correlated with important elements of job performance. This is true of both the Merit Board certification process and the "final review" procedures of the Bureau of Human Resources.

71.     The unreliability of Defendants' procedures is demonstrated by the fact that, after three Plaintiffs filed classwide charges of discrimination with the EEOC, Defendants reopened the applications of a number of African American applicants and hired them. These class members, including Plaintiff Richardson, are successfully performing the job duties of a Cook County Correctional Officer,

demonstrating that they are fully qualified for the position and were denied employment, not for any legitimate reason, but because they are African American.

72. Alternatively, in the event that Defendants' selection procedures are shown to be job related and consistent with business necessity, less discriminatory alternatives exist that the Defendants have refused to adopt. Such less discriminatory alternatives include, for example:

a. "Blind" recruitment procedures designed to eliminate bias.

b. Adoption of objective hiring criteria.

c. Elimination of racial bias in the personal history questionnaire.

d. Racial diversification of the Merit Board.

e. Conducting polygraph testing in compliance with the American Polygraph Association Standards of Principles and Practices or, alternatively, eliminating unreliable polygraph testing from the hiring process.

f. Anti-bias training for all individuals involved in hiring decisions, including the Merit Board members, Merit Board staff, background investigators, polygraph examiners, and hiring officials in the CCSO Bureau of Human Resources.

g. Periodic audits to ensure that African American applicants are not disproportionately eliminated, and remedial action to correct any adverse impact identified.

73.     Defendants have also engaged in a pattern and practice of intentional race discrimination against Plaintiffs and the proposed class.

74.     Defendants are well aware that they are hiring only a small number of African Americans as Correctional Officers and that this pattern repeated itself in every training class for five years, from 2013 to 2017. In addition, they are well aware that their subjective and "color coded" hiring procedures are an invitation to discriminate on the basis of race.

75.     Plaintiffs and class members have written letters of protest to the Merit Board and the CCSO asking for reconsideration of their rejected applications and complaining about mistreatment during the hiring process. Their complaints have fallen on deaf ears.

76.     On December 10, 2015, incumbent African American Correctional Officers met with Robert Egan, the CCSO's Compliance Officer, Undersheriff Zelda Whittler, and James P. Roache, Inspector General of the CCSO, to complain about racial discrimination against African American applicants and officers. Egan, Whittler, and Roache said they would be "looking into" the issues and would discuss the hiring "numbers" with an African American county commissioner. Defendants continued to discriminate against African American applicants after this meeting.

77.     It has been reported to incumbent African American Correctional Officers that, after the Plaintiffs filed discrimination charges with the EEOC, an employee newly assigned to the CCSO's Bureau of Human Resources discovered that the application files of African Americans had been kept apart from others.

78.     Defendants have also tried to actively conceal the low rate of hiring of African Americans. In October 2015, an incumbent African American Correctional Officer filed a FOIA request for 2013-2015 hiring data. In response, the CCSO created a spreadsheet with the names of what it claimed to be "Blacks" hired from 2013 to 2015. But at least 24 of the individuals on the list are actually white or Hispanic, not African American.

79.     Defendants' racial discrimination against the Plaintiffs and other class members throughout the class period has been the result of either express hiring policies or widespread practices so pervasive that they constitute a custom or practice of intentional discrimination.

## CLASS ALLEGATIONS

80.     Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of:

> All African Americans who applied for the position of Correctional Officer with the Cook County Department of Corrections and were rejected for employment after January 23, 2014.

81.     Plaintiffs are members of the class they seek to represent.

82.     The members of the class are so numerous that joinder of all members is impracticable. Although Plaintiffs do not know precisely how many African Americans were rejected for the Correctional Officer position since January 2014, their number is far greater than can be feasibly addressed through joinder. The identity of individual class members is readily ascertainable from Defendants' hiring records.

83.     There are questions of fact and law common to the class, which are both well suited to classwide adjudication and predominate over any questions affecting only individual class members. These common, predominating questions include: (a) whether Defendants' hiring practices disproportionately eliminated African Americans from the Correctional Officer hiring process; (b) whether Defendants' hiring practices that disproportionately eliminated African Americans were job-related and consistent with business necessity; (c) whether less discriminatory alternative procedures existed which Defendants have refused to adopt; (d) whether Defendants intended to discriminate against African Americans on the basis of race; and (e) whether there is a basis for municipal liability.

84.     The named Plaintiffs' claims are typical of the claims of other class members in that each of them applied and was rejected for employment as a Cook County Correctional Officer on the basis of their African American race.

85.     Plaintiffs will fairly and adequately represent and protect the interests of the class. They have retained experienced and accomplished counsel who are able and prepared to expend the resources necessary to litigate this case.

86.     A class action is superior to other methods for fairly and efficiently adjudicating this controversy.

87.     Alternatively, classwide liability under the theories advanced in this complaint could properly be certified under Rule 23(c)(4).

## FIRST CLAIM FOR RELIEF
### Title VII — Disparate Impact

**88.**     Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**89.**     In rejecting the employment applications of the named Plaintiffs and other class members, Defendants have used selection procedures that have a disparate impact on the basis of race and are neither job-related for the Correctional Officer position nor consistent with business necessity. The foregoing conduct constitutes unlawful discrimination in violation of 42 U.S.C. § 2000(e) et seq.

**90.**     Defendants have also failed and refused to use available alternative hiring procedures that are valid and less discriminatory.

## SECOND CLAIM FOR RELIEF
### Title VII — Disparate Treatment

**91.**     Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**92.**     Defendants have intentionally discriminated against Plaintiffs and other class members by rejecting their employment applications on the basis of race.

**93.**     The acts and omissions of the Defendants constitute a pattern or practice of racial discrimination against Plaintiffs and other class members.

## THIRD CLAIM FOR RELIEF
### Equal Protection — 42 U.S.C. § 1983

**94.**     Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

95.　At all times relevant, Defendants have acted under color of law.

96.　Defendants knew that African American applicants were being disproportionately rejected for employment as Correctional Officers.

97.　Defendants knew that their hiring procedures were subjective, unreliable, and unscientific.

98.　Defendants intended to discriminate against Plaintiffs and other class members on the basis of race.

99.　In failing to take action to ensure equal employment opportunities for African American applicants, Defendants were deliberately indifferent to their constitutional right to equal protection.

100.　As a direct and proximate result of Defendants' deliberate indifference, the named Plaintiffs and other class members have been injured and damaged.

## FOURTH CLAIM FOR RELIEF
### 42 U.S.C. § 1981 — brought under 42 U.S.C. § 1983

101.　Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

102.　At all times relevant, Defendants have acted under color of law.

103.　Defendants knew that African American applicants were being disproportionately rejected for employment as Correctional Officers.

104.　Defendants knew that their hiring procedures were subjective, unreliable, and unscientific.

105.　Defendants intended to discriminate against Plaintiffs and other class members on the basis of race in the making of an employment contract.

24

**106.** In failing to take action to ensure equal employment opportunities for African American applicants, Defendants were deliberately indifferent to their statutory right under Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, to be free from racial discrimination in the making and enforcement of an employment contract.

**107.** As a direct and proximate result of Defendants' deliberate indifference, the named Plaintiffs and other class members have been injured and damaged.

## FIFTH CLAIM FOR RELIEF
## Illinois Civil Rights Act, 740 ILCS 23/5

**108.** Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**109.** As a direct and proximate result of the conduct described above, Defendants violated the Illinois Civil Rights Act of 2003, 740 ILCS 23/5.

## INDEMNIFICATION
## (against Cook County only)

**110.** Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**111.** Because the CCSO and Merit Board are funded by the County, Cook County is responsible to indemnify the CCSO and the Merit Board against damages, including attorney's fees, recovered from them by Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class pray that this Court:

A.      Certify the claims in this complaint for class-wide adjudication, under Federal Rule of Civil Procedure 23(b)(2), (b)(3) and/or (c)(4);

B.      Appoint Plaintiffs' Counsel as Class counsel pursuant to Rule 23(g)(1);

C.      Declare that Defendants have engaged in a policy, custom, or practice that deprives Plaintiffs and other class members of rights protected by Title VII, Section 1981, the Fourteenth Amendment, and the Illinois Civil Rights Act;

D.      Order injunctive relief against Defendants, including that they adopt and implement policies, procedures, and practices that will ensure equal employment opportunity for African Americans in hiring and eliminate all vestiges of racial discrimination in the hiring process for Correctional Officers;

E.      Appoint an independent monitor to oversee Defendants' adoption and implementation of the required policies, practices, and procedures, and to report to the Court;

F.      Award Plaintiffs and the Class all available legal and equitable relief including instatement, backpay, retroactive seniority, and compensatory damages;

G.      Order Defendants to pay Plaintiffs' reasonable attorney's fees and expenses, including expert costs; and

H.      Order all other appropriate relief as the interests of justice may require.

## JURY DEMAND

Plaintiffs request a jury trial for all claims that may be tried to a jury.

Dated: January 24, 2018

Respectfully submitted,

/s Marni Willenson
One of the Attorneys for Plaintiffs

Marni Willenson
marni@willensonlaw.com
Samantha Kronk
skronk@willensonlaw.com
WILLENSON LAW, LLC
542 S. Dearborn St.
Suite 610
Chicago, IL 60605
312.508.5380