## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH D.G. SIMPSON, *et al.*, on behalf of themselves and all others similarly situated, | ) ) ) | Case No. 18-cv-553 |
| Plaintiffs, | ) ) ) | Judge Sharon Johnson Coleman Mag. J. Heather K. McShain |
| v. | ) ) | |
| SHERIFF TOM DART, in his official capacity, *et al.* | ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT
## OF THEIR MOTION FOR CLASS CERTIFICATION

This motion seeks to certify a class of African Americans who were rejected, during the proposed class period, for positions as Correctional Officers with the Cook County Sheriff's Office ("CCSO"), as the result of a biased hiring process. Throughout the class period, the Defendants—Thomas J. Dart in his official capacity as the Cook County Sheriff and the Cook County Sheriff's Merit Board (the "Merit Board")[1]—relied on the same, centralized steps and process for screening class members for positions as Correctional Officers (with changes to one of the steps in 2016). And that process disqualified Black candidates *four times more often* than it disqualified White candidates, a discrepancy of more than fourteen standard deviations. (The Seventh Circuit has stated that a suspicion of discrimination is triggered by disparities of two standard deviations or more. The disparities here are far greater).

---

[1]      Cook County is a defendant solely as an indemnitor of both other defendants.

Evidence suggests the discrimination here was intentional. The Defendants have known about: (a) dramatic decreases in the percentage of Black hires starting no later than 2013, (b) the marked adverse impact of their hiring process on Black candidates during the period from 2014-18, and (c) the absence of any evidence establishing the validity of their process (that is, evidence that successful applicants were demonstrably more likely to succeed on the job than rejected applicants). Yet they chose to stick by their process. These are stark facts that "suggest a common answer to the central question: why were African American laborers disfavored?" *Zollicoffer, v. Gold Standard, Baking, Inc.*, 335 F.R.D. 126, 155 (N.D. Ill. 2020).

On these facts, at least four questions cry out for classwide adjudication—that will be much more efficiently resolved once, for all class members, than in separate individual proceedings (leading to potentially inconsistent outcomes). These common, classwide questions are:

> The Defendants' motives and intent: Did the Defendants choose, or have they chosen to stick with, their hiring process because of its adverse impact against Black applicants?
>
> Disparate impact: Do the data establish that Black candidates are rejected at significantly higher rates than White candidates?
>
> Validity (or job relatedness): Is the Defendants' hiring process job related and consistent with business necessity, notwithstanding its adverse impact against Black applicants? And,
>
> The availability of lesser discriminatory alternatives: Are there alternative hiring processes of substantially equal or greater validity that will cause less disparate impact?

For purposes of adjudicating these questions, the Court should certify, under Fed. R. Civ. Proc. 23(b)(3), the following class:

> All Black applicants for Correctional Officer positions at the Cook County Department of Corrections filled on or after March 1, 2015 who were disqualified at one of the following five steps in the hiring process: the first written test, the physical fitness test, the second written test, the Merit Board final review, or the CCSO polygraph/administrative review.

## II. FACTUAL BACKGROUND

The following are material facts bearing on class certification.

1. Between 2014 and 2018, more than 5,500 candidates were considered for positions as Correctional Officers. Ex. A (Scherbaum Report) at 21. Black candidates far outnumbered White candidates (2,124 Black to 1,255 White). *Id*. However, Defendants selected about 2.5 times as many White candidates as Black candidates (261 White to 106 Black). *Id*. Put differently, a White applicant was four times as likely to be hired as a Black applicant. *Id*. at 10, 21.

2. The Seventh Circuit has said that a difference between the expected and observed minority hires of two standard deviations[2] is enough to give rise to a reasonable inference that the hiring was not race-neutral. *Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 424 (7th Cir. 2000); *see also Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n.14 (1977) (stating that a difference of greater than two or three standard deviations "would be suspect"). In this case, by contrast,

---

[2] Standard deviation measures how far a number is from the expected norm or average value. *See Adams*, 231 F.3d at 424.

the disparity between Black and White hire rates is 14 standard deviations, Ex. A (Scherbaum Rep.) at 22, which far exceeds the Seventh Circuit's threshold.

3. The hiring process is centralized and administered, jointly, by the CCSO and by the Merit Board. The process proceeds in 14 steps, seven administered by the Merit Board and seven by the CCSO.

4. The Merit Board conducts the initial review of candidates by administering: (1) an application screening for minimum qualifications (e.g. a high school diploma or GED); **(2) a first written test consisting of 200 multiple choice questions; (3) a second written test consisting of 30 multiple choice questions; (4) a physical ability test;** (5) fingerprinting and a drug test; (6) submission of a personal history questionnaire and interview with a background investigator; and **(7) review by the Merit Board**. Ex. B (Decl. of Rosemarie Nolan); Ex. C (Deposition of Rosemarie Nolan) at 53-55, 62-63.

5. Following the Merit Board's review, candidates "certified" by the Merit Board as "eligible" move forward to the next steps of the hiring process, conducted by the CCSO, which administers: **(8) a polygraph examination and "administrative" or "file" review**; (9) a panel interview; (10) a background check; (11) selection for the Sheriff's Training Institute; (12) orientation for the Sheriff's Training Institute; (13) offer of employment; and finally (14) hiring. Ex. D (Dep. of Matthew Burke) at 94:6-97:10; Ex. E (SEAM Article A (1/27/17 Revision)) at 4-7; Ex. F (SEAM Article A (4/17/2014 Revision)).

6. Plaintiffs' claims of discrimination in this case center on five of the steps in the Defendants' hiring process (each bolded in paragraphs 4 and 5 above), specifically: the first written test (step 2), the second written test (step 3), the physical fitness test (step 4), a final review of surviving candidates conducted by the Merit Board (step 7), and a polygraph examination and "administrative" or "file" review conducted by CCSO (step 8). About 99% of the Black candidates rejected during the hiring process are rejected at one of these five steps. To the extent that there are racial disparities in selection rates at these five steps, there are racial disparities in selection rates for the hiring process as a whole.

7. The first written test is a 200-question, multiple choice test known as the National Criminal Justice Officer Selection Inventory Test ("NCJOSI"). Ex. B (Nolan Decl.) ¶ 3. The test was created by a private company, Industrial Organizational Solutions ("IOS"). Ex. C (Dep. of Rosemarie Nolan) at 39:22-40:2-16; Ex. G (County contract with IOS). Candidates must achieve a threshold score to continue forward in the hiring process. *Id*. Between 2014 and 2018, 36% of Black candidates were rejected at this step, compared to 21% of White candidates. Ex. A (Scherbaum Rep.) at 23, 27. The disparity is measured by over 12 standard deviations, far in excess of the two standard deviation threshold. *Id*. at 25-26.

8. The second written test is a 30-question Situation Based Styles Assessment for Law Enforcement, also created by IOS. Ex. B (Nolan Decl.) ¶ 4; Ex. C (Nolan Dep.) at 40:22-41:9; Ex. G (County contract). Candidates must achieve a threshold score to continue forward in the hiring process. Ex. B (Nolan Decl.) ¶ 4.

Between 2014 and 2018, 16% of Black candidates were rejected at this step, compared to 4% of White candidates. Ex. A (Scherbaum Rep.) at 30. The disparity is measured by about eight standard deviations. *Id*.

9.      The physical abilities test requires candidates to perform 24 bent-leg sit-ups in one minute, run 1.5 miles in 16.52 minutes, and bench press 52% of their body weight. Ex. B (Nolan Dec.) ¶ 5. Between 2014 and 2018, 24% of Black candidates were rejected at this step, compared to 9 percent of Whites. Ex. A (Scherbaum Rep.) at 29. This disparity is measured by over ten standard deviations. *Id*.

10.     Candidates who pass the two written exams and the physical abilities test move on to a background investigation that includes their submission of a "personal history questionnaire" and a meeting with an investigator. Ex. B (Nolan Dec.) ¶¶ 7-11. The investigator collects information and creates a summary document highlighting that information and sends the entire file to the Merit Board for the Merit Board's "Final Review." Ex. B, Nolan Dec., ¶¶ 7-11; Ex. H (Decl. of John J. Dalicandro) ¶¶ 2, 5-8. Each Board Member reviewing a file indicates their selection preference (certify or reject) before passing the file to other Board Members, increasing the likelihood that one Member's discriminatory bias will influence the outcome. Ex. C (Nolan Dep.) at 171:19-24. The Board's Executive Director and 30(b)(6) witness is unaware of any criteria that Board Members use in making the decision, and they do not record the reasons for their "votes." *Id*. at 171, 180.

Between 2014 and 2018, 40% of Black candidates were rejected at this step, compared to only 14% of Whites. Ex. A (Scherbaum Rep.) at 34.

11.    Candidates who pass the Merit Board's "Final Review" are "certified" by the Merit Board and proceed to the next step in the hiring process which is the CCSO's "administrative" or "file" review step. Though it consists of two components, the CCSO considers it a single step in the hiring process. Ex. D, Burke Dep. at 45:3-46:7; 94:6-97:10. A polygraph examiner administers a pre-polygraph questionnaire and then conducts a polygraph examination. *Id.* at 82:21-83:11. Documents from the polygraph examiner are placed in the candidate's file, which is then reviewed. *Id.* at 89:3-19. A staff member from the CCSO's Bureau of Human Resource reviews the files and determines whether to reject candidates. *Id.* at 138:20-140:12.[3] The staff member applies a centrally prepared list of disqualification factors in making this decision. *Id.* at 97:11-98:10. Between 2014 and 2018, almost 45% of Blacks were rejected at this step, compared to 36% of Whites. Ex. A (Scherbaum Rep.) at 37. The disparity is measured by 2.24 standard deviations. *Id.*

12.    Since at least 2013, the number and percentage of Black applicants hired as Correctional Officers in Cook County has dropped off substantially. Dkt. No. 81 (Am. Compl.) ¶¶ 4-7. And throughout the class period, both the CCSO and Merit Board were aware of racial disparities in selection rates. According to CCSO's 2015 EEO-1 report, Black correctional officers outnumbered White officers. Ex. I (CCSO

---

[3] From March 2016 to the summer of 2016, the CCSO instituted a three-member administrative review panel to review any candidate rejected by a staff member. Ex. D (Burke Dep.) at 136:10-14; 137:4-12; 138:10-15.

2015 EEO Report). During the 2015-18 period, however, it hired 2.5 times as many White employees as Black employees. Ex. A (Scherbaum Rep.) In 2016, a representative of IOS, the company that created the two written exams that are part of the hiring process, made a presentation to CCSO staff that addressed, among other issues, the adverse impact of the NCJOSI (first written) test. Ex. J (Emails and IOS Presentation) at MB165, MB171-91. IOS recommended changes, including lowering the passing score on the NCJOSI. Ex. J (IOS Presentation) at MB191. Changes were made, but not enough to eliminate the disparate impact of the test. Ex. A (Scherbaum Rep.) at 26.

13. IOS also recommended that Defendants obtain "local validity evidence" to support their use of the NCJOSI. Ex. J (IOS Presentation) at MB191. Defendants have not done so. *See* Dkt. No. 142 (IOS' Response to Pls.' Mot. to Compel) at 10-11 (IOS stating that "there are no validation studies administered by IOS for Cook County" and that it "did not have a local validation study for Cook County").

14. Defendants have also taken affirmative steps to attempt to conceal the marked adverse impact of their hiring process. The Merit Board misrepresented to the EEOC that it did not have any race data concerning the hiring process (after the filing of race discrimination charges), *see* Ex. K (Merit Board Amended MIDP Response) (Nolan informed two EEOC investigators in an interview "that the Merit Board does not track racial data concerning candidate applications"), and both Defendants misrepresented to this Court that they do not track race data concerning candidate applications, *see* Ex. L (6/27/18 Tr.) at 8:12 (CCSO counsel

stated that "we don't have a database of" race); 9:16-19 (Merit Board counsel stated that its applicant database "doesn't have a subsection for marking race."). Such race data was in fact available and forms the bases for Plaintiffs' adverse impact analyses. Ex. A, Scherbaum Rep. at 14-15; *see also* Ex. M (Deposition of Amar Patel) at 85-86.

15.     Each of the four named plaintiffs – Joseph D.G. Simpson, Frederick Merkerson, Maurice Richardson, and Jonathan Harris – is Black, applied for a correctional officer position with the CCSO, met the minimum qualifications as reflected in their progress through the hiring process, and was rejected. Dkt. No. 81 (Am. Compl.) ¶¶ 16-19. Simpson applied four times during the period. *Id.* 16. He was notified that he failed the first written test on his final attempt. *Id.* ¶ 27; *see also* Dkt. 166 (Merit Board Ans.) ¶ 27. On one of Simpson's earlier attempts, he cleared all the Merit Board steps before the CCSO notified him that it had rejected him at the polygraph and file review step. Dkt. No. 81 (Am. Comp.) ¶ 25; Dkt. No. 166 (Merit Board Ans.) ¶ 25; Dkt. No. 101 (CCSO Ans.) ¶ 25. The other three plaintiffs similarly were rejected at one of the subjective steps, either the Merit Board final review or the CCSO polygraph and file review step. Dkt. No. 81 (Am. Comp.) ¶¶ 33, 45-46, 56; Dkt. No. 101 (CCOS Ans.) ¶¶ 46, 56; Dkt. No. 166 (Merit Board Ans.) ¶ 33.

16.     During their interviews with the Merit Board investigators or the polygraph examiners, Simpson, Merkerson, and Richardson heard statements reflecting employees' beliefs about racial discrimination in the hiring process or

employees' negative stereotyped beliefs about Black candidates. Dkt. No. 81 (Am. Compl.) ¶¶ 26, 30-31, 45. A deputy sheriff, who was a Merit Board investigator, told Plaintiff Merkerson in 2015 that the Merit Board could use one of his questionnaire answers to "fuck with [him]" and that the Board would try to "fuck [him] over, because they're not hiring black folks." *Id*. ¶ 31. After assuring the CCSO's polygraph examiner that he had no gang affiliations and that his father, a correctional officer, kept him on the right track, the examiner asked Plaintiff Simpson, "Well, if you had to pick a gang, which one would you pick?" *Id*. ¶ 26. Similarly, during Plaintiff Richardson's polygraph examination in 2015, the examiner charged that Richardson "must have" sold drugs and "must have" been in a gang because he grew up in the Robert Taylor Homes, a public housing project. He also repeatedly accused Richardson of "lying" or "concealing things." *Id*. ¶ 45.

17.    Merkerson, Richardson, and Harris filed timely class charges of discrimination with the EEOC and received right to sue letters. Dkt. No. 81 (Am. Compl.) ¶¶ 35, 42, 50, 57. After Richardson filed his charge, CCSO informed him that it was re-reviewing his file and then changed its decision and offered him a correctional officer position. *Id*. ¶ 18, 51. He remains a correctional officer but lost out on over a year of pay and benefits. *Id*. The other three plaintiffs have never been offered correctional officer positions. *Id*. ¶¶ 28, 43, 58.

18.    Plaintiffs' counsel have retained Dr. Charles Scherbaum, an industrial/organizational psychologist who is a professor at Baruch College, City University of New York, to analyze the data concerning the hiring process produced

by Defendants. He has prepared a report concluding that Defendants disproportionately selected White candidates at each of the five challenged steps and overall in the hiring process. Ex. A. His testimony would be central to Plaintiffs' case at trial.

## III. ARGUMENT

Rule 23 imposes the following requirements before a class may be certified. First, a class must satisfy each of the four elements of Rule 23(a), namely, that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Then, the class must also satisfy the requirements of at least one subsection of Rule 23(b).

"By its terms," Rule 23 "creates a categorical rule entitling a plaintiff whose suit meets the[se] specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). Here, all elements of Rule 23(a) are satisfied, as are the requirements of Rule 23(b)(3). Therefore, by the terms of Rule 23, a class should be certified.

### A. The Proposed Class Satisfies the Requirements of Rule 23(a)

### 1. The Class is more than sufficiently "numerous."

"'Although there is no 'magic number' of class members for numerosity purposes [under Rule 23(a)(1)], when a class numbers at least 40, joinder will be

considered impracticable.'" *Mullen v. GLV, Inc.*, No. 18 C 1465, 2019 WL 265080, at *2 (N.D. Ill. Jan. 18, 2019) (quoting *Hale v. AFNI, Inc.*, 264 F.R.D. 402, 404 (N.D. Ill. 2009)); *see Gunn v. Stevens Sec. & Training Servs.*, Inc., No. 17-cv-06314, 2019 WL 2502019, at *3 (N.D. Ill. June 17, 2019) (Coleman, J.) (holding that classes of 60 and 90 members satisfy numerosity requirement). Here, through 2018, the Merit Board rejected at least 1,885 Black candidates and the CCSO rejected another 109 Black candidates. Ex. A (Scherbaum Rep.) at 23, 37. An unknown number of additional Black candidates have been rejected since then. These numbers easily satisfy the numerosity requirement.

> ## 2. The key questions, both legal and factual, are overwhelmingly "common."

To satisfy the commonality requirement of Rule 23(a)(2), Plaintiffs must show the existence of one "question[] of law or fact common to the class." Fed. R. Civ. P. 23(a)(2); *see Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011). "Even a single [common] question' will do." *Id.* "'A common nucleus of operative fact is usually enough to satisfy' this requirement." *Gunn*, 2019 WL 2502019, at *3 (quoting *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)). Here, at least four common questions will "generate common answers apt to drive the resolution of the litigation.'" *Yata v. BDJ Trucking Co.*, No. 17-cv-03503, 2020 WL 1062332, at *4 (N.D. Ill. Mar. 5, 2020) (Coleman, J.) (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)). Those questions are:

> The Defendants' motives and intent: Did the Defendants choose, or have they chosen to stick with, their hiring process because of its adverse impact against Black applicants?

<u>Disparate impact</u>: Do the data establish that Black candidates are rejected at significantly higher rates than White candidates?

<u>Validity (or job relatedness)</u>: Is the Defendants' hiring process job related and consistent with business necessity, notwithstanding its adverse impact against Black applicants? And,

<u>The availability of lesser discriminatory alternatives</u>: Are there alternative hiring processes of substantially equal or greater validity that cause less disparate impact?

**a. Whether Defendants adopted or persisted in practices that hired White candidates at rates four time higher than Black candidates because they disadvantaged Black candidates is capable of classwide resolution.**

Plaintiffs' disparate treatment claim raises a common question that will be resolved based on common evidence: did Defendants intentionally adopt (or maintain) procedures to disproportionately weed out Black applicants? In other words, "why were African American laborers disfavored?" *Zollicoffer*, 335 F.R.D. at 154-55 (citing *Wal-Mart*, 564 U.S. at 352). Classwide evidence bearing on the Defendants' intent to discriminate will include: (a) statistics showing that Defendants' hiring procedures rejected Blacks at four times the rates of whites, *Id.* at 154 (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 n.20 (1977) ("Statistics showing racial or ethnic imbalance are probative . . . because such imbalance is often a telltale sign of purposeful discrimination'"); *see also Coates v. Johnson & Johnson,* 756 F.2d 524, 532 (7th Cir. 1985) ("The plaintiffs' prima facie case will thus usually consist of statistical evidence demonstrating substantial disparities in the application of employment actions as to minorities and the unprotected group, buttressed by evidence of general policies or specific instances of

discrimination."); (b) evidence of Defendants' knowledge of that racial disparity; (c) evidence of Defendants' indifference to the disparity, including by their having declined to take steps recommended to them to address it; and (d) evidence of the ready availability of alternative hiring procedures, that would have served Defendants' legitimate interests equally or better, while reducing or eliminating the adverse impact.

In addition to statistical proof, common evidence of Defendants' intent to discriminate includes their decision, after being told that the first written test disproportionately eliminated Black applicants, to adopt only modest changes rather than taking steps to eliminate that adverse impact. *See* Ex. J at MB197; see also Ex. A (Scherbaum Rep.) at 74. The misrepresentations concerning the availability of race information to the EEOC and this Court, Exs. K, L, is also common evidence reflecting intent.

### b. Whether Defendants' procedures have a disparate impact on Black candidates is capable of classwide resolution based on common evidence.

Title VII disparate impact claims are resolved using a three-stage burden-shifting framework set forth in 42 U.S.C. § 2000e-2(k):

First, the plaintiff must produce evidence of an employment practice that "causes a disparate impact on the basis of" a protected characteristic (e.g. race). 42 U.S.C. § 2000e-2(k)(1)(A)(i). This generally requires statistical evidence of the disproportionate exclusion of protected group members. *See Palomares v. Second Fed. Sav. & Loan Ass'n of Chicago*, No. 10 CV 6124, 2014 WL 4291795, at *2 (N.D.

Ill. Aug. 28, 2014) (citing *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994 (1988)). Once a disparate impact has been shown, the burden shifts to the employer "to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i). "Unless and until the defendant pleads and proves a business necessity defense, the plaintiff wins simply by showing the stated elements of a Title VII disparate impact claim." *Lewis v. City of Chicago*, 560 U.S. 205, 213 (2010). "The touchstone is business necessity. If an employment practice which operates to exclude [minorities] cannot be shown to be related to job performance, the practice is prohibited." *Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971); *see also Albermarle Paper Co. v. Moody*, 422 U.S. 405, 426 (1975).

Finally, even if the employer proves business necessity, in the "third step," a plaintiff can still prevail by identifying alternative hiring processes of substantially equal or greater validity that cause less disparate impact. *See* 42 U.S.C. §2000e-2(k)(1)(A)(ii); *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 999 (1988) (plaintiff can still win by demonstrating that "other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship.")

Claims that tests have disparate impact are ideal for class certification. *See Wal-Mart*, 564 U.S. at 353 ("if the employer 'used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test

15

clearly would satisfy the commonality and typicality requirements of Rule 23(a)'") (quoting *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159 n.15 (1982)). So too are claims that a small group of decisionmakers made subjective decisions that disproportionately weeded out members of a protected group. *See Chi. Teachers Union, Local No. 1 v. Bd. of Educ. of Chi.*, 797 F.3d 426, 438-40 (7th Cir. 2015) (commonality satisfied when "a small group of decision-makers" together in a room selected schools for "reconstitution")

　　As in all other disparate impact cases, Plaintiffs will start by using common evidence to show that Defendants' hiring process disproportionately excludes Black candidates, primarily the testimony of Dr. Scherbaum.[4]

　　At that point, Defendants will be required to prove that, despite the racial disparities, their hiring procedures are "job related . . . and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i). Evidence (if any) that Defendants' processes are scientifically valid will also be common.

　　Finally, even if Defendants prove that the hiring process is valid, Plaintiffs can still prevail with evidence of less discriminatory alternatives. *See Chi. Teachers Union, Local 1 v. Bd. of Educ.,* 419 F. Supp. 3d 1038, 1052 (N.D. Ill. 2020). Evidence

---

[4] Simultaneously with their filing of their class certification motion, Plaintiffs have filed a motion to exclude the report and testimony of Defendants' expert, Dr. Jonathan Guryan. (Dkt. Nos. 195, 196.) If the Court does not exclude the report, it in fact supports the contention that Plaintiffs' claims raise common issues. All of Dr. Guryan's opinions and analyses are common in nature; he does not base any analyses on the existence of multiple decisionmakers, let alone try to show that some decisionmakers had statistically different racial outcomes in their decisions than did other decisionmakers.

16

of alternatives, such as the existence of tests of substantially equal validity that would reduce or eliminate the adverse impact, will also be common.

### 3. The Named Plaintiffs' claims are "typical" of the claims of other class members.

To satisfy Rule 23(a)(3)'s requirement that a class representative's claim be typical of those of the unnamed class members, "[a] class representative's injuries need not be identical to those of the class, but they must arise from the same common events, practices, or conduct and must be based on the same legal theory." *Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*, No. 15-cv-3187, 2018 WL 1535156, at *5 (N.D. Ill. Mar. 29, 2018) (Coleman, J.) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "[P]articularized defenses that the defendant may have against certain class members" do not defeat typicality. *Id.*

Plaintiffs' claims arise from the same "events, practices, or conduct" as the claims of other class members. Simpson was rejected in 2016 by the CCSO following his polygraph examination, Ex. N (Rejection Letter), and in 2017 as a result of the Merit Board's first written test, Dkt. No. 166 (Merit Board Ans.) ¶ 27; *see also* Dkt. No. 101 (CCSO Ans.) ¶ 25. Merkerson was rejected at the Merit Board Final Review step, Dkt. No. 166 at 33, and Richardson and Harris were rejected at CCSO's polygraph and administrative review step. Dkt. No. 81 (Am. Compl.) ¶¶ 45-46, 55-56; Dkt. No. 101 (CCSO Ans.) ¶¶ 45-46, 55-56. They also assert the same disparate impact and disparate treatment theories as the rest of the class. They thus satisfy the typicality requirement.

17

### 4. Both the Named Plaintiffs and their counsel can be trusted to adequately protect the interests of all class members.

Rule 23(a)(4) requires that the Class Representatives must "fairly and adequately protect the interests of the class." That standard is met when the interests of the Class Representatives are not antagonistic to the interests of other class members; and alignment is assured when, as here, both the Class Representatives and other class members challenge the same hiring process and have the same interest in establishing the Defendants' liability. Rule 23(g) also requires the appointment of adequate counsel to represent the class. Here, Class Counsel—from the law firms Willenson Law LLC, Mehri & Skalet, PLLC, and Hughes Socol Piers Resnick & Dym—are highly qualified and experienced class action lawyers. Ex. O (Willenson Decl.); Ex. P (Karsh Decl.); Ex. Q (Piers Decl.). The requirements of Rule 23(a)(4) and 23(g) are satisfied.

### B. The Proposed Class also Satisfies the Requirements of Rule 23(b)(3).

A class qualifies under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs satisfy both these conditions.

18

**1. Questions common to class members predominate over questions affecting only individual members.**

The significant questions pertaining to Plaintiffs' disparate impact and disparate treatment claims are common, and because their answers will drive the resolution of this litigation, they also predominate.

To the extent individualized relief may become an issue, that will not defeat predominance. *Yata*, 2020 WL 1062332, at *5. And in this case, as in other Title VII classwide hiring discrimination cases, individualized relief is not likely to become an issue. When, as here, the number of rejected Black candidates who met the minimum criteria for the position far exceeds the number of "shortfall" positions and Defendants' actions have made it impossible to determine which of the candidates would have been hired in the absence of discrimination, the only fair process is to determine the amount that the underhired Black candidates would have earned and allocate it in a fair manner among class members. In other words, hiring opportunities, backpay, and other remedies will apply to the entire class. *See, e.g., Lewis v. City of Chicago*, No. 98 C 5596 (certified class of more than 5,000 African American applicants for positions with the Chicago Fire Department, successfully challenging a hiring process that had a disparate impact on African American applicants, injunctive relief order provided hiring opportunities, classwide backpay, and other remedies). This case, in which Defendants eliminated through standardized tests and centralized subjective decisionmaking more Black candidates than there were vacancies, presents a paradigmatic situation in which common questions predominate over individualized ones.

### 2. A class action is superior to other methods for adjudicating the matter

Rule 23(b)(3)'s superiority requirement "is satisfied if 'a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Gunn*, 2019 WL 2502019, at *6 (quoting *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). The rule identifies four factors pertinent to the superiority determination. Fed. R. Civ. P. 23(b)(3). As discussed below, each supports class certification in this case.

1. Class members have little to no interest in filing individual lawsuits or otherwise controlling the litigation of their claims. Even if rejected Black candidates could obtain in an individual lawsuit the data concerning all candidates with which to analyze whether Defendants' hiring process disproportionately eliminated black candidates, the cost of engaging an expert witness to analyze and report on that information would be prohibitive relative to their individual potential recoveries. *See, e.g., In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 315 (N.D. Cal. 2018) ("Litigation costs would be quite high, given that the case involves complex technical issues and requires substantial expert testimony."). The expense barrier would be especially high in a situation such as this in which, as discussed above, the number of rejected, qualified Black candidates greatly outnumber the expected number of Black hires (the "shortfall"), making it difficult for any individual to prove that they would have been hired but for the discrimination.

2.  Plaintiffs are unaware of any Black applicants who have individually challenged their rejection for the position of correctional officer with CCSO except for Louise Monae, the plaintiff in the related case

3.  This is the desirable forum in which to concentrate class members' claims. All class members were harmed by the Defendants' conduct in this district.

4.  This class case does not present unusual manageability problems. There are substantial common issues that outweigh any individual issues. And as the Seventh Circuit explained in *Carnegie v. Household Int'l, Inc.*, where the requirements of Rule 23 have otherwise been met, "a class action has to be unwieldy indeed before it can be pronounced an inferior alternative—no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." 376 F.3d 656, 661 (7th Cir. 2004).

### III.  CONCLUSION

For all the reasons stated above, the Court should certify the Class, either as framed in this motion or, if the Court deems adjustments necessary, with those adjustments, and appoint undersigned counsel as Class Counsel pursuant to Rule 23(g).


Dated:  November 6, 2020                    Respectfully submitted,

                                                        /s/ Chirag G. Badlani

                                                        *One of the attorneys for Plaintiffs*

Marni Willenson
marni@willensonlaw.com
WILLENSON LAW, LLC
542 S. Dearborn St., Ste. 610
Chicago, IL 60605
(312) 508-5380
(312) 508-5382 Fax

Cyrus Mehri
CMehri@findjustice.com
Ellen Eardley
EEardley@findjustice.com
Michael Lieder
MLieder@findjustice.com
Joshua Karsh
JKarsh@findjustice.com
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Ste. 300
Washington, D.C. 20036
202.822.5100

Matthew J. Piers
mpiers@hsplegal.com
Caryn C. Lederer
clederer@hsplegal.com
Chirag G. Badlani
cbadlani@hsplegal.com
Justin Tresnowski
Jtresnowksi@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM,
LTD.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
312.580.0100

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 6, 2020, I caused a copy of the foregoing document to be served via the electronic case file system upon counsel of record for all parties.

/s/ Chirag G. Badlani
One of the attorneys for Plaintiffs