## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH D.G. SIMPSON, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 18-cv-0553 |
| | ) | |
| v. | ) | Judge Sharon Johnson Coleman |
| | ) | |
| SHERIFF TOM DART, in his official | ) | |
| capacity, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs, on behalf of themselves and others similarly situated, filed this putative class action lawsuit challenging the hiring practices for Correctional Officers at the Cook County Department of Corrections as racially discriminatory against African-Americans in violation of Title VII, 42 U.S.C. § 1981, the Illinois Civil Rights Act, 740 ILCS 23/5(a)(1), and the Equal Protection Clause of the United States Constitution. Before the Court is plaintiffs' motion for class certification brought pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3). For the following reasons, the Court, in its discretion, denies plaintiffs' motion for class certification because they have not established the commonality requirement under Rule 23(a)(2).

**Background**

Plaintiffs brought this lawsuit against Cook County Sheriff Tom Dart in his official capacity ("Sheriff's Office" or "CCSO") and the Cook County Sheriff's Merit Board ("Merit Board") based on theories of disparate impact and discriminatory intent.[1] The parties have engaged in fact and expert discovery for approximately three years. Meanwhile, in plaintiffs' reply brief in support of their motion for class certification, they restructured their proposed class into several subclasses.

---

[1] The companion case to this lawsuit is *Monae v. Cook County Sheriff's Office*, 18 C 0424, which is only against defendant Sheriff's Office and not the Merit Board.

Thereafter, the Court granted plaintiffs leave to file a Second Amended Complaint so they could redefine their proposed class into smaller subclasses. The Court also granted defendants leave to file a sur-reply to the class certification motion to address the newly-defined class and subclasses.

In their Second Amended Complaint, plaintiffs allege from at least 2013, there has been a substantial drop in the number and percentage of African-Americans hired as Correctional Officers for the Cook County Jail. They further assert that during the class period defendants' hiring selection and screening criteria have not been job-related nor reliable and have had an adverse impact on African-Americans. Plaintiffs also allege that defendants have engaged in a pattern or practice of intentional race discrimination against them.

The Correctional Officer hiring process consists of several steps conducted by two separate entities, the Merit Board and the Sheriff's Office. Applicants must first successfully complete the Merit Board process and obtain certification before they are eligible to begin the Sheriff's hiring process. The Merit Board was created by statute, namely, the Illinois County Police Department Act, 55 ILCS 5/3-7001 *et seq.* There have been fourteen members on the board, who have served different terms over the class period. The individual members of the Merit Board are not employees of the Sheriff's Office. The Merit Board's certification process has seven steps: (1) screening for minimum qualifications; (2) an initial written examination; (3) a second written examination; (4) a physical ability test; (5) finger printing and drug testing; (6) a personal history questionnaire and follow-up interview; and (7) final review by the Merit Board members.

Once the Merit Board certifies a candidate, the applicant proceeds to the first step of the Sheriff's hiring process, which is a polygraph/file review. During this step, a certified examiner uses a polygraph machine to identify countermeasures and then asks a series of questions intended to elicit admissions of disqualifying criteria. The examiner creates a report discussing the disqualifying criteria, which is then reviewed by a human resources administrator. Certain admissions are cause

2

for automatic disqualification, such as admitting to the use of heroin or cocaine within a certain time period before applying to be a Correctional Officer. Other admissions to the disqualifying criteria are further investigated, including applicants who admit to acts of violence. This review process has changed during the class period, including the number of administrators who review the polygraph report, along with changes to the disqualification criteria. By way of example, an applicant in March 2015 who admitted to using marijuana within the three years prior to their application would have been automatically disqualified, whereas a 2016 applicant who admitted to using marijuana in the last week would not have been automatically disqualified. Other steps to the Sheriff's review, some of which have been discontinued, include screening for criminal history, a panel interview, a physical test, a background check, and attendance at the Sheriff's Training Institute.

Plaintiffs seek to certify a combined class of Black applicants for Correctional Officer positions at the Cook County Jail, along with five subclasses as outlined below:

**Proposed Classes**

<u>Combined Class</u>, consisting of all Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified at one of these five steps in the hiring process—the first written test, the second written (situation) test, the physical fitness test, the Merit Board final review, or the CCSO polygraph/administrative review— and who would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 for purposes of Title VII claims or who were notified of their disqualification on or after January 24, 2016 for purposes of all other claims.

<u>The CCSO Subclass</u>, consisting of all Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified by the CCSO during its File Review and who would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 for purposes of Title VII claims or who were notified of their disqualification on or after January 24, 2016 for purposes of all other claims.

<u>Merit Board Subclass 1</u>, consisting of all Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified because of their score on the Merit Board's first written test and who would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 for purposes of Title VII claims or who were notified of their disqualification on or after January 24, 2016 for purposes of all other claims.

3

Merit Board Subclass 2, consisting of all Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified because of their score on the Merit Board's "situation" or second written test and who would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 for purposes of Title VII claims or who were notified of their disqualification on or after January 24, 2016 for purposes of all other claims.

Merit Board Subclass 3, consisting of all Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified because of their performance on the Merit Board's physical fitness test and who would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 for purposes of Title VII claims or who were notified of their disqualification on or after January 24, 2016 for purposes of all other claims.

Merit Board Subclass 4, consisting of all Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified by the Merit Board during its Final Review and who would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 for purposes of Title VII claims or who were notified of their disqualification on or after January 24, 2016 for purposes of all other claims.

(R. 274, Second Am. Compl. ¶ 125.)

**Legal Standard**

"To achieve certification, a proposed class under Rule 23(b) must meet the requirements of Rule 23(a)—numerosity, typicality, commonality, and adequacy of representation—and one of the alternatives listed in Rule 23(b)." *Howard v. Cook County Sheriff's Office*, 989 F.3d 587, 597 (7th Cir. 2021). To certify a class, the Court must apply a rigorous analysis in determining whether the plaintiff has established the Rule 23(a) prerequisites. *McFields v. Dart*, 982 F.3d 511, 516 (7th Cir. 2020). Once a plaintiff shows all of Rule 23(a)'s requirements, if the plaintiff seeks class certification under Rule 23(b)(3), the district court must then determine whether common questions of law or fact predominate over individual questions and if the class action is superior to other methods of litigating the case. *Id.* at 518; *Howard*, 989 F.3d at 597. The requirements for class certification are more than pleading requirements—if the parties dispute material factual issues, the Court reviews the evidence and resolves the disputes before deciding whether to certify the class. *In re Allstate*

*Corp. Sec. Litig.,* 966 F.3d 595, 603 (7th Cir. 2020); *Szabo v. Bridgeport Mach., Inc.,* 249 F.3d 672, 676

(7th Cir. 2001). The party seeking class certification bears the burden of proving by a

preponderance of the evidence that the proposed class satisfies Rule 23. *Howard,* 989 F.3d at 597.

**Discussion**

*Combined Class*

Defendants challenge the combined class definition under Rule 23(a)(2)'s commonality

factor, which requires "questions of law or fact common to the class." "Superficial common

questions like whether each class member 'suffered a violation of the same provision of law' do not

suffice." *Howard,* 989 F.3d at 598 (citation omitted). Rather, to fulfill the commonality requirement,

plaintiffs' claims must depend on a common contention of "such a nature that it is capable of

classwide resolution—which means that determination of its truth or falsity will resolve an issue that

is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes,* 564

U.S. 338, 350, 131 S.Ct. 2541, 180 L.Ed.2d 374 (2011). Simply put, commonality requires "the

capacity of a classwide proceeding to generate common answers apt to drive the resolution of the

litigation." *Id.* (citation omitted).

In *Wal-Mart,* female employees of defendant's retail stores throughout the United States

brought Title VII claims alleging sex discrimination. When determining commonality, the Supreme

Court concluded that the defendant's conduct in relation to the nationwide class varied from

plaintiff to plaintiff, and thus there were no common answers that would drive the class action

lawsuit. *See id.* at 359-60; *Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 756 (7th Cir. 2014). However,

"[w]here the same conduct or practice by the same defendant gives rise to the same kind of claims

from all class members, there is a common question." *Suchanek,* 764 F.3d at 756.

As to plaintiffs' proposed combined class, they assert that the common question is whether

the Sheriff's Office, on its own or through its agent the Merit Board, engaged in a pattern or practice

of disproportionality rejecting Black applicants amounting to intentional discrimination. Under this argument, proof of commonality overlaps with plaintiffs' merits contention that defendants engaged in a pattern or practice of unlawful discrimination. *Wal-Mart*, 564 F.3d at 352. "In a pattern-or-practice case, the plaintiff tries to 'establish by a preponderance of the evidence that … discrimination was the company's standard operating procedure.'" *Id.* at 352 n.7 (quoting *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 336, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

Defendants argue plaintiffs cannot show commonality for the combined class because they did not present evidence that the Sheriff's Office or the Merit Board engaged in an intentional pattern and practice of discrimination, namely, that race discrimination resulted from their "standard operating procedure." The Court agrees because the evidence does not support a reasonable inference that the same conduct or practice by the same defendant gave rise to plaintiffs' claims. Instead, the record shows that the hiring of Correctional Officers involves multiple and distinct decision makers, along with a polygraph/administrative review, physical fitness tests, and written standardized tests that a third-party vendor administers. Further adding to the complexity of the hiring decisions during the class period is the number of changes made to the hiring criteria, including changes to the polygraph/review disqualifying criteria. There were also changes to the members of the Merit Board, as well as different human resource administrators reviewing the candidates' files for the Sheriff's Office. In essence, plaintiffs bring this lawsuit based on hundreds of different employment decisions made by different decision-makers. As the Supreme Court concluded in *Wal-Mart*, "[w]ithout some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class members' claims for relief will

produce a common answer." *Id.* at 352 (emphasis in original). Such is the case for the combined

class. The Court therefore denies plaintiffs' class certification motion as to the combined class.[2]

*CCSO (Sheriff's Office) Subclass*

Plaintiffs' proposed Sheriff's Office subclass pertains to applicants who were disqualified by

the Sheriff's Office during its polygraph/file review. During this first step of the hiring process, the

Sheriff's Office evaluates each applicant's certified file against fifty separate disqualification criteria.

In support of this subclass, plaintiffs contend that the Sheriff's Office has consistently applied

higher standards and levels of scrutiny to Black applicants and has disproportionately disqualified

Black applicants based on racially-biased criteria. Plaintiffs have not presented evidence backing up

their allegations nor have they identified a company-wide policy to meet the commonality criteria

under Rule 23(a)(2). *See Wal-Mart*, 564 U.S. at 359 ("Because respondents provide

no convincing proof of a companywide discriminatory pay and promotion policy, we have

concluded that they have not established the existence of any common question").

One way of showing a company-wide, racially-biased hiring practice or policy is statistical

evidence. *See id.* at 356; *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 717 (7th Cir. 2012). In their legal

memoranda, plaintiffs highlight the following calculations presented by their expert Dr. Charles A.

Scherbaum: (1) between 2014 to 2018 more than 5,550 candidates were considered for positions as

Correctional Officers; (2) of these 5,550 candidates, 2,124 applicants were Black and 1,255 were

White; and (3) defendants selected about 2.5 times as many White candidates and Black candidates.

These statistics represent raw numbers. Under the circumstances, a plaintiff's statistical evidence

"must take into account the most common nondiscriminatory reasons for the alleged unfair

---

[2] Plaintiffs' reliance on the Seventh Circuit's decision in *McReynolds* is misplaced because in that case, the class plaintiffs identified two distinct company-wide policies that purportedly caused discrimination. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 488 (7th Cir. 2012).

employment practice," and also "take into account the major variables one might expect to cause a statistical disparity." *Mozee v. American Commercial Marine Serv. Co.,* 940 F.2d 1036, 1047 (7th Cir. 1991). At his deposition, Dr. Scherbaum admitted that he did not control for any racially neutral factors, therefore, his analysis falls short of the standard required to establish a discriminatory hiring policy or practice through statistical evidence. *See Adams v. Ameritech Services, Inc.,* 231 F.3d 414, 424 (7th Cir. 2000) ("plaintiffs' evidence [] was wanting because it assumed that the job applicants were identical in every respect except for race, even though other factors like physical condition, employment history, or other non-racial variables might have entered into the employer's calculus."). Accordingly, Dr. Scherbaum's calculations have little probative value.

Also, plaintiffs may use anecdotal evidence to show a company-wide policy. *See Wal-Mart,* 564 U.S. at 358. In their opening brief, plaintiffs provide one anecdotal account of racial discrimination, namely, class representative Frederick Merkeson stated that a Merit Board investigator told him "they're not hiring black folks." Plaintiffs, however, must provide more than one account of racial discrimination to raise an inference that the Sheriff's Office (or Merit Board) operates under a general policy of discrimination. *See id.* at 358-59 (anecdotal evidence from one in every eight class members considered significant).

Here, plaintiffs' other anecdotal evidence involves their argument that several of the CCSO's fifty disqualifying criteria are evidence of racially-biased hiring practices. The first disqualifying criteria plaintiffs highlight involve gang members. Evidence shows that during the class period, the Sheriff's Office disqualified then current gang members from the applicant pool and investigated former gang members. Also, the Sheriff's Office investigated candidates who failed to disclose that family or friends were gang members. In response to these criteria, plaintiffs argue:

> The CCSO makes false suppositions about candidates' family members' gang
> affiliation—based on error-ridden information from the Chicago Police Department's
> discredited and wildly overinclusive "Gang Databases." Those databases incorrectly

identify approximately 11 percent—a staggeringly preposterous percentage—of Chicago's Black population as gang members.

Plaintiffs' argument is speculative and not supported by the record. For example, evidence shows that at the first step of the process, the Sheriff's Office learns of gang status through the applicant's admissions and not through the so-called "Gang Databases." Instead, these databases are listed for human resources administrators to check with no corresponding reference to disqualification. In addition, plaintiffs do not explain what "false suppositions" the Sheriff's Office makes nor do they point to evidence supporting this statement. As such, this anecdotal evidence fails to raise a reasonable inference of a company-wide policy to support Rule 23(a)(2)'s commonality requirement.

Next, plaintiffs take issue with the Sheriff's Office use of polygraph testing in the file review step of the application process. Specifically, plaintiffs argue that the Sheriff's Office uses "pseudoscientific polygraph procedures" and "does not record audio or video of its polygraph examinations, in violations of established standards of practice." As discussed, under this step, a certified examiner uses a polygraph examination to elicit admissions of disqualifying events. The examiner creates a report discussing the disqualifying criteria, which human resources administrators then review. The polygraph results do not disqualify a candidate, but assist the Sheriff's Office in its review of the disqualifying criteria. Meanwhile, plaintiffs' mere citation to articles about lie detector tests and racial bias to support their conclusion that the Sheriff's Office uses racially-biased criteria asks the Court to make an unsupported inferential leap, which the Court is not willing to make. In the end, plaintiffs' arguments concerning the polygraph tests and the Sheriff's use of them has little probative value in establishing a company-wide policy for commonality purposes.

Turning to plaintiffs' other arguments concerning the Sheriff's Office, they contend that if a candidate makes an omission on his or her personal history questionnaire, the Sheriff's Office

presumes it is willful rather than innocent.  Again, plaintiffs misstate this criteria, which actually

states if an applicant has been deceitful, fraudulent, or failed to disclose information or made

omissions regarding a pertinent document, the result is disqualification.  Moreover, plaintiffs do not

explain why this disqualification factor is racially-biased or how it evidences a company-wide policy.

Also unsupported by the record are plaintiffs' arguments that the Sheriff's Office uses misdemeanor

convictions as a disqualification factor and rejects candidates based on family ties, friendships, or

association with convicted felons.  Also, plaintiffs do not describe why these factors are racially

biased.

      In summary, plaintiffs' anecdotal evidence amounts to speculation, misstatements, or

misunderstandings of the CCSO's disqualification criteria.  Accordingly, both the anecdotal and

statistical evidence plaintiffs present is too weak to raise a reasonable inference that the Sheriff's

Office applied a uniform or company-wide practice on a class-wide basis to fulfill Rule 23(a)(2)'s

commonality requirement.  *See Wal-Mart*, 564 U.S. at 353.  The Court denies plaintiffs' motion to

certify the Sheriff's Office subclass.

*Merit Board Written Standardized Test Subclasses*

      Plaintiffs seek to certified two subclasses related to the written standardized tests that are

part of the Merit Board's certification process.  The first written examination is the National

Criminal Justice Officer Selection Inventory—Integrity Test.  Between 2014 and April 2016, the

minimum threshold score for this first examination was 75% and after April 2016, the minimum

score was 70%.  The second written test is the Situation-Based Styles Assessment for Law

Enforcement.  The minimum threshold score for the second examination was 70% throughout the

class period.  These tests are prepared by an outside vendor, I/O Solutions, and have been validated

in a number of jurisdictions and by numerous agencies across the country for use by law

enforcement.

In support of these two separate subclasses, plaintiffs rely on the Supreme Court's *Wal-Mart* decision that when an employer uses biased testing to evaluate applicants, the commonality and typicality requirements are fulfilled. *See id.* at 353; *see also General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 159 n.15, 72 L.Ed.2d 740 (1982). Plaintiffs, however, have made little effort to establish that these standardized tests are racially biased. Rather, they argue that although the tests have been validated in other jurisdictions and by agencies throughout the country, the Merit Board must still validate them. Plaintiffs do not point to any legal authority requiring "local validation" under the circumstances. In any event, at this juncture it is plaintiffs' burden to establish by a preponderance of the evidence that that the proposed classes satisfy Rule 23, which means even if the Merit Board did not independently validate I/O Solutions' tests, plaintiffs must still show that these tests are racially biased to establish commonality under *Wal-Mart*.

Here, plaintiffs present Dr. Scherbaum's calculations that between 2014 and 2018, 36% of Black candidates were rejected at the first examination step as compared to 21% of White candidates and 16% of the Black candidates were rejected at the second examination step as compared to 4% of the White candidates. As discussed, plaintiffs cannot meet their burden by relying on straight percentage comparisons alone. *See Bolden v. Walsh Const. Co.,* 688 F.3d 893, 896 (7th Cir. 2012) (expert analysis failed to control for variables other than race); *see, e.g., Richardson, Jr. v. Rush-Presbyterian-St. Luke's Med. Ctr.*, No. 99 C 7549, 2002 WL 461695, at *15 (N.D. Ill. Mar. 26, 2002) (Pallmeyer, J.). Because Dr. Scherbaum did not control for any racially neutral factors, such as education level or work history, to explain statistical disparities, these calculations have little significance when determining commonality under *Wal-Mart* and its progeny. Therefore, the Court denies plaintiffs' motion as to Merit Board subclasses 1 and 2.

*Merit Board Physical Ability Test Subclass*

Plaintiffs' Merit Board subclass 3 involves the physical ability test. This test requires applicants to accomplish the following physical requirements: (1) 24 bent-leg sit ups in one minute; (2) one repetition bench press of 52% of the applicant's body weight; and (3) run 1.5 miles in 16.52 minutes or less. These requirements come from the Illinois Law Enforcement Training and Standards Board.

Plaintiffs do not explain or substantiate how the physical fitness test is racially biased. For example, plaintiffs do not present evidence that the physical ability test was administered in a racially-biased manner. Plaintiffs, however, provide raw numbers from Dr. Scherbaum's report, namely, that between 2014 and 2018, 24% of the Black applicants were rejected at this step compared to 9% of White applicants. Because Dr. Scherbaum did not factor out the effect of neutral influences, his calculations add little to the Court's analysis. Also, it is plaintiffs' burden to isolate and identify the specific employment practices that are responsible for any statistical disparities, which plaintiffs have failed to do. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988). Instead, plaintiffs broadly point to the physical ability test without further explanation. The Court therefore denies plaintiffs' motion to certify Merit Board subclass 3.

*Merit Board Final Review Subclass*

In Merit Board subclass 4, plaintiffs seek to certify a class of applicants who were disqualified by the Merit Board during the final review by board members. Plaintiffs state that the Merit Board rejects 40% of the Black applicants at this hiring step, but only 14% of White applicants. Once again, straight percentage comparisons of selection rates have little probative value on their own. *See Barricks v. Eli Lilly & Co.*, 481 F.3d 556, 559 (7th Cir. 2007) ("We have frequently discussed the dangers of relying on raw data without further analysis or context in employment discrimination disputes.").

Evidence in the record shows that during this step, the Merit Board members independently review the applicants' files and make a judgment about whether the applicant should be certified. The file contains the applicant's personal history questionnaire, which contains information about the applicant's criminal records, education levels, work history, and other information. The record before the Court also indicates that different members of the Merit Board have different concerns during the final review step and that the members have considerable discretion in reviewing the candidates' files. In the end, the Merit Board certifies an applicant once a majority of the board's members approves his or her file.

In the context of commonality, the Seventh Circuit has held "subjective, discretionary decisions can be the source of a common claim if they are, for example, the outcome of employment practices or policies controlled by higher-level directors, if all decision-makers exercise discretion in a common way because of a company policy or practice, or if all decision-makers act together as one unit." *Chicago Teachers Union, Local No. 1 v. Board of Educ. of City of Chicago*, 797 F.3d 426, 438 (7th Cir. 2015). This is because "discretionary authority exercised by high-level corporate decision-makers, which is applicable to a broad segment of the corporation's employees, is more likely to satisfy the commonality requirement than the discretion exercised by low-level managers." *Id.* at 440 (citation omitted). Here, the evidence shows that the Merit Board decision-makers exercised their discretion in various ways.

Rather than addressing this standard or the evidence the Merit Board presented, plaintiffs speculate as to how the final review process enables racial discrimination. In doing so, plaintiffs contend that the review files are race-coded because each file contains a photo of the candidate, the board members' review is unconstrained, the reasons for rejections are purposely kept secret, and that Blacks have been under-represented as decision makers on the Merit Board. Plaintiffs also

make the unsubstantiated claim that the Merit Board has taken extraordinary measures to conceal known race disparities in its hiring practices.

Plaintiffs do not explain how these factors enable discrimination against Black applicants, but instead leave it to the Court to fill in the blanks. Equally important, plaintiffs' speculative and unsupported arguments do not fulfill their burden of showing that despite the discretionary nature of the Merit Board's final review step, the board members exercised their discretion in the same manner or that the board members acted as one. *See Chicago Teachers Union,* 797 F.3d at 438; *see also Wal-Mart,* 564 U.S. at 353 ("The whole point of permitting discretionary decisionmaking is to avoid evaluating employees under a common standard."). The Court therefore denies plaintiffs' motion to certify subclass 4.

The parties have conducted fact and expert discovery over the last three years, yet plaintiffs have not set forth evidence to meet their burden that class members were rejected by the Merit Board or Sheriff's Office based on racially-biased criteria or a company-wide policy. And, although Dr. Scherbaum's straight percentage comparisons of selection rates indicate racial disparity in the hiring of Correctional Officers for the Cook County Department of Corrections, these percentages, on their own, do not support an inference that defendants applied a uniform or company-wide practice on a class-wide basis to fulfill Rule 23(a)(2)'s commonality requirement under *Wal-Mart.*

**Conclusion**

Based on the foregoing, the Court, in its discretion, denies plaintiffs' motion for class certification in its entirety [197].

Date: 9/13/2021

Entered: _____

SHARON JOHNSON COLEMAN
United States District Judge