## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JOSEPH D.G. SIMPSON, FREDERICK MERKERSON, MAURICE RICHARDSON, JONATHAN HARRIS, DARIUS J. JOHNSON, CHARLES DUNNER, JR., ELZINA WILLIAMS-GRAY, and TIFFANY HARRISON, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) | Case No. 18-cv-553 |
| | ) | Judge Sharon Johnson Coleman |
| Plaintiffs, | ) ) | Mag. J. Heather K. McShain |
| v. | ) ) | |
| THOMAS J. DART, in his official capacity as Sheriff of Cook County, COOK COUNTY SHERIFF'S MERIT BOARD, and COUNTY OF COOK, | ) ) ) ) ) | |
| Defendants. | ) ) | **JURY TRIAL DEMANDED** |

### THIRD AMENDED COMPLAINT

Plaintiffs Joseph D.G. Simpson, Frederick Merkerson, Maurice Richardson, Jonathan Harris, Darius J. Johnson, Charles Dunner, Jr., Elzina Williams-Gray, and Tiffany Harrison, on behalf of themselves and all others similarly situated, file this Third Amended Complaint against Defendants Sheriff Thomas Dart, in his official capacity as Sheriff of Cook County ("Dart," "Cook County Sheriff's Office," or "CCSO"), the Cook County Sheriff's Merit Board ("Merit Board"), and the County of Cook ("the County"):

### NATURE OF THE CASE

1.      This is a class action complaint brought to remedy race discrimination in employment against African Americans applying to be Correctional Officers at

the Cook County Department of Corrections—in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*; Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981; the Illinois Civil Rights Act, 740 ILCS 23/5(a)(1); and the Equal Protection Clause of the United States Constitution.

2.　　Plaintiffs seek to certify four classes of Black applicants for Correctional Officer positions at the Cook County Jail who were disqualified at one of three steps in the hiring process, and who, if they had not been disqualified, would have been eligible for entry-level Correctional Officer positions filled on or after March 12, 2015 (for purposes of Title VII claims) and on or after January 24, 2016 for purposes of all other claims.

3.　　For decades, a substantial proportion—often exceeding a majority—of the sworn sheriff deputies employed as Correctional Officers at the Cook County Department of Corrections have been African American. Public sector employment has historically been an important source of employment for African Americans. See http://laborcenter.berkeley.edu/pdf/2011/blacks_public_sector11.pdf. These employment patterns have held true in Cook County, where African Americans make up approximately 25% of the workforce but hold a higher percentage of public sector jobs, including as Cook County Correctional Officers.

4.　　Despite the historic availability of these positions to qualified African Americans, since at least 2013, there has been a substantial drop off in the number and percentage of African Americans hired as Correctional Officers in Cook County.

2

5.     According to the CCSO's own EEO-1 data for fiscal year 2015, the CCSO hired 251 protective service officers—but only 42 of those new officers were African American.

6.     And according to additional data provided to the Equal Employment Opportunity Commission ("EEOC") in its investigation of the charges of racial discrimination filed by the Plaintiffs in this case: (a) the CCSO's November 16, 2015 Correctional Officer class had only four African Americans in a class of 47 new hires (8.5%); (b) the January 25, 2016 class had only seven African Americans in a class of 52 new hires (13.5%); and (c) the April 18, 2016 class had only five African Americans in a class of 39 new hires (12.8%).

7.     In almost all training classes conducted between 2013 and 2017, African Americans have been significantly underrepresented. The CCSO hired 18 classes of new Officers between January 2013 and August 2015. In response to a FOIA request, the CCSO generated a list of "Blacks" hired in these classes, which averaged around 50 new Correctional Officers each. The CCSO identified the number of blacks hired into each of those classes as follows:

| Class | Black Hires Per CCSO |
|---|---|
| Jan. 2013 | 14 |
| April 2013 | 9 |
| June 2013 | 7 |
| Aug. 2013 | 7 |
| Sept. 2013 | 9 |
| Nov. 2013 | 7 |
| Dec. 2013 | 5 |
| Feb. 2014 | 11 |
| Mar. 2014 | 9 |

| | |
|---|---:|
| Apr. 2014 | 10 |
| June 2, 2014 | 8 |
| June 30, 2014 | 6 |
| Aug. 2014 | 2 |
| Sept. 2014 | 8 |
| Nov. 2014 | 11 |
| Apr. 2015 | 8 |
| June 2015 | 7 |
| Aug. 2015 | 12 |

Total:                                         150

**8.**      The numbers in the table above, although evidencing the underrepresentation of African Americans, actually understate the problem. At least 24 of the 150 persons hired that the CCSO reported as "Black" in its FOIA response are actually white or Hispanic.

**9.**      There is no legitimate, non-discriminatory explanation for the drop off in African American hires, compared to white hires.

**10.**      Since 2013 at least, Defendants' selection and screening criteria for hiring have not been job related or reliable and have had an adverse impact on African Americans. The invalidity and unreliability of the process are reflected in the experience of a named Plaintiff and class members who were rejected for employment until the Plaintiffs in this case filed EEOC charges and the CCSO "reconsidered" some previously rejected applicants and hired them.

**11.**      On information and belief, the Defendants have intentionally discriminated against black applicants. The numbers—the stark decrease in African Americans hired after 2013—for which the Defendants provided the EEOC no explanation, are prima facie evidence of that. Likewise, the remarks made to

applicants by Defendants' agents during the hiring process—for example, to Plaintiff Merkerson that he could expect to be "fuck[ed] over, because they're not hiring black folks" or to a class member that "it seems to me all Cook County wants to do is hire white boys"—are probative of intentional discrimination. And so is the fact that, as the EEOC also discovered, applicants' files are color-coded. Each applicant file includes both a photograph of the applicant and other indicia of their racial background—an invitation to discriminate. Until Plaintiffs filed EEOC charges, the CCSO Bureau of Human Resources apparently kept African American files separated from others—or so African Americans currently employed as Correctional Officers have been informed.

12.     Since 2013 at least, the disproportionate rejection of African American applicants in the hiring process has been so well-settled and pervasive as to constitute the de facto equivalent of a formal policy of excluding African Americans because of their race.

13.     Unless enjoined by this Court, the Defendants will continue to discriminate against African Americans applying to be Correctional Officers for the CCSO and Cook County.

## JURISDICTION AND VENUE

**14.** This Court has jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3). The Court has supplemental jurisdiction over Plaintiffs' state law claims under 29 U.S.C. § 1367.

**15.** Venue is proper in this District pursuant to 28 U.S.C. § 1391(b). The acts that gave rise to the claims alleged in this Complaint occurred in Illinois and in this District.

## PARTIES

**16.** Plaintiff Joseph D.G. Simpson, an African American, submitted four applications to the Merit Board for the position of Correctional Officer, in 2014, 2015, and 2017. Each time, he was rejected for employment.

**17.** Plaintiff Frederick Merkerson, an African American, submitted an application to the Merit Board for the position of Correctional Officer in 2015. He was notified that he had been disqualified for employment in October 2015, which prevented him from obtaining employment on January 25 or April 18, 2016.

**18.** Plaintiff Maurice Richardson, an African American, submitted applications to the Merit Board for the position of Correctional Officer in late 2014, in 2015, and in 2017. He was rejected for employment in February and November 2015. The November 2015 rejection prevented him from obtaining employment on January 25 or April 18, 2016. After he filed his EEOC charge, and while his 2017 application was pending, the CCSO contacted him and said they were "reconsidering" him and then hired him into the June 2017 training class.

19.     Plaintiff Jonathan Harris, an African American, submitted an application to the Merit Board for the position of Correctional Officer in 2014 and was notified of his rejection for employment on March 20, 2015.

20.     Plaintiff Darius J. Johnson, an African American, submitted an application to the Merit Board for the position of Correctional Officer in 2018 and 2019 and was rejected both times.

21.     Plaintiff Charles Dunner, Jr., an African American, submitted applications to the Merit Board for the position of Correctional Officer in late 2016 or early 2017 and twice in 2018.  Each time, he was rejected for employment.

22.     Plaintiff Elzina Williams-Gray, an African American, submitted an application to the Merit Board for the position of Correctional officer in 2017, for which she was rejected.

23.     Plaintiff Tiffany Harrison, an African American, submitted two applications to the Merit Board for the position of Correctional Officer in 2015 and was rejected both times.

24. Defendant County of Cook ("Cook County" or "the County") is a body politic and corporate, organized under Illinois' County Code, 55 ILCS 5/1-1001 *et seq*. The County employs Correctional Officers at the Cook County Department of Corrections ("Jail"). Operational responsibilities for the Jail are shared between the County and the CCSO.

25.     The County is a necessary party to this complaint, by virtue of its responsibility to indemnify the CCSO and the Merit Board for monetary amounts

recovered by the Plaintiffs through this action. *Carver v. Sheriff of La Salle County*, 324 F.3d 947 (7th Cir. 2003).

26.     Defendant Thomas J. Dart, Sheriff of Cook County, is an independently-elected constitutional officer, with responsibility and authority for running the Department of Corrections, a bureau within the Sheriff's Office, including for promulgating rules, regulations, policies, and procedures governing the hiring of Correctional Officers. He has final policymaking authority, and has been the final policymaker, regarding all policies, customs and practices of the Sheriff's Office alleged in this Amended Complaint. He performed all acts and omissions attributed to him in this Complaint under color of law.  He is sued only in his official capacity as Sheriff, not in his personal capacity.

27.     Cook County Sheriff's Office (the CCSO) is a unit of local government, organized under 55 ILCS 5/3-6001–6036. At all times relevant, the CCSO has been a signatory (or joint signatory, along with the County) to collective bargaining agreements governing the employment of Correctional Officers at the Cook County Jail.

28.     Defendant Cook County Sheriff's Merit Board is an administrative body that obtains its power by virtue of statute, 55 Ill. Comp. Stat. 5/3-7002, with a board of seven to nine members appointed by the Sheriff, subject to approval by the county board. The Merit Board's purpose is to create employment policies and make employment decisions for the CCSO and shares authority with the CCSO for hiring

decisions. The Merit Board is the final policymaker for the CCSO on decisions not to certify applicants as "eligible for hire" by the CCSO and the County.

## FACTUAL ALLEGATIONS

### Plaintiff Simpson

29.     Plaintiff Joseph D.G. Simpson applied to be a Correctional Officer at the Department of Corrections four times from 2014 to 2017. His father is a sworn deputy sheriff and has been employed as a Correctional Officer at the Jail since 1991. His grandfather was also a Correctional Officer who retired from the position around 1993 after many years of service. Plaintiff Simpson's most recent rejection was in 2018. After submitting his 2015 application, he passed the written examination, the situation test, the physical examination, and a rigorous background check and was certified for employment by the Merit Board. Yet despite Merit Board certification, the CCSO rejected him for employment.

30.     The deputy sheriff assigned to the background investigation on Simpson's 2015 application, named "Smith," told him that there was "no reason not to hire him" and that he would "hire him right now if he could." After Merit Board certification, he was subjected to racially charged questioning before and during the polygraph exam. After assuring the polygraph examiner that he had no gang affiliations and that his father, a Correctional Officer, keeps him on the right track, the examiner asked, "Well, if you had to pick a gang, which one would you pick?" Upon information and belief, this examiner did not ask white applicants who denied gang affiliations which gang "they would pick."

9

31.     Plaintiff Simpson re-applied to be a Correctional Officer at the Department of Corrections in late 2017.  He received a letter from the Merit Board dated January 16, 2018 that informed him that his application had been disqualified because he had failed to qualify on the written examination administered by the Merit Board.

32.     Plaintiff Simpson was and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Merkerson**

33.     Plaintiff Frederick Merkerson applied to be a Correctional Officer at the Department of Corrections in June or July 2015, after his honorable discharge as a Specialist in the United States Army. From 2010-2014, he spent four years on active duty with the Army, including a one-year deployment in Afghanistan.

34.     After submitting his application to the Merit Board, he took and passed the written examination, situation test, physical fitness test, and a drug test. After completing the exhaustive background questionnaire, he turned it in to an employee at the Cook County Administration Building. The employee flipped through the questionnaire and told him that he needed to explain his answer to a question about child support payments. The employee handed him a paper and pen, and Merkerson wrote the explanation, as directed.

35.     A short time later, the assigned background investigator, a deputy sheriff named "Woods" called him in for an interview. At the interview, Woods told

Merkerson that the Merit Board might frown upon the handwritten explanation about the child support payments. He said that they could use it just to "fuck with [him]," and that they would try to "fuck [him] over, because they're not hiring black folks." He instructed Merkerson to send the explanation in an email instead, which Merkerson did. A few days later, the investigator called and told him that he was pushing his application through to the Merit Board and recommending that he get the position. The investigator made the same statement to one of Merkerson's references, when he called to do the reference check.

36.     The references in support of Merkerson's application included a U.S. Army captain (now an Army major), an Army sergeant, and an Army staff sergeant—all of whom vouched for Merkerson's character.

37.     Despite his military service in Afghanistan, the recommendation of the CCSO investigator, and the endorsement of three U.S. Army officers, the Merit Board refused to certify Merkerson as eligible for hire as a Correctional Officer. He received a Notification of Disqualification from the Merit Board on October 27, 2015.

38.     If the Merit Board had not disqualified Merkerson, the first class of correctional officers that the CCSO hired of which he could have been a member was hired on January 25, 2016.  He also could have been a member of the class of correctional officers hired on April 18, 2016.

39.     On January 8, 2016, Merkerson filed a class action charge of discrimination with the EEOC, alleging race discrimination in the hiring process for

Cook County Correctional Officers. It named the Cook County Sheriff's Office as the employer, and not also the Merit Board. However, the charge alleged, among other things, that he had to complete a background questionnaire that included a question about knowledge of gang members that would have an adverse impact against African Americans and Latinos. The Merit Board would have known that it was the entity that administered the background questionnaire. The charge further alleges that a background investigator told him that the Merit Board would use one of his answers to try to "fuck [me] over, because they're not hiring black folks." Finally, the charge alleges that the investigator stated that he would recommend that Merkerson get the position, but the Merit Board informed him on October 27, 2015 that he had been disqualified.

40.     The EEOC became even more aware of the Merit Board's role during its investigation of the charges of Plaintiffs Merkerson, Richardson, and Harris. Counsel for the charging parties provided information in writing and by telephone indicating that aspects of the Merit Board review process had a disparate impact on African Americans applicants and that the Merit Board intentionally was disproportionately weeding out African American applicants.

41.     As part of its investigation of the three charges, the EEOC asked the Cook County General Counsel to provide it, among other information, data concerning every applicant considered by the Merit Board and separately to provide data concerning every applicant considered by the Sheriff's Office.

12

42.     Throughout the EEOC investigation, lawyers from the Cook County General Counsel's office represented both the CCSO and the Merit Board.

43.     As part of the investigation, on August 25, 2016 two EEOC investigators met for an extensive interview with Rosemarie Nolan, the Executive Director of the Merit Board, and two attorneys from the Cook County General Counsel's office to discuss each step in the process by which the Merit Board screened applicants for Correctional Officer positions.

44.     Through that interview and the EEOC's other information requests, CCSO and the Merit Board understood that in the EEOC's investigation of the three charges the agency sought information on both the Merit Board's and CCSO's decision-making processes and on the impact of the decisions made by both entities. In response to the EEOC's information requests, the Cook County General Counsel's office sent the EEOC information about the Merit Board's policies and practices as well as CCSO's policies and practices.

45.     The Merit Board was aware that Merkerson's charge of discrimination was against it as well as CCSO.  It is plausible to infer that the Merit Board also knew it had the opportunity to participate in any conciliation efforts both from its representation by the Cook County General Counsel's office and by its Executive Director's participation in an investigative meeting with the EEOC.

46.     Nonetheless, Merkerson's complaint to the EEOC has been to no avail. Although the CCSO "reopened" or "reconsidered" the applications of certain African American applicants after the Plaintiffs filed EEOC charges, they did not offer to

13

hire Merkerson. Merkerson received notification from the EEOC of his right to file this case and has done so within 90 days of his receipt of that notice.

47.     Merkerson was and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Richardson**

48.     Plaintiff Maurice Richardson applied to be a Correctional Officer in late 2014 or early 2015, in 2015, and in 2017. On the second application, he passed the written test, situation test, and physical fitness test. Deputy Sheriff Fontella Brown-Marshall was assigned to his background investigation and recommended him for hire. The Merit Board certified him as eligible for hire on September 24, 2015.

49.     After Merit Board certification, he was required to take a polygraph test. The examiner was an older white male, believed to be Edward Fisher, who asked multiple racially charged questions both before and during the administration of the polygraph test. For example, he said he "knew" that Richardson "must have" sold drugs and "must have" been in a gang because he grew up in the Robert Taylor Homes, a public housing project. He repeatedly accused Richardson of "lying" or "concealing things," although he had no non-discriminatory basis to believe that he was lying about his background.

50.     On November 4, 2015, the CCSO Bureau of Human Services sent Richardson a letter rejecting his employment application.

14

51.     After receiving notice of his rejection, he contacted Brown-Marshall to inform her of the rejection and to report the polygraph examiner's discriminatory conduct. She suggested that he write a letter to the Merit Board about how he was treated—which he did.

52.     On November 25, 2015, Richardson wrote the letter, directing it to James P. Nally, Chairman of the Merit Board. He explained that the polygraph examiner had created an "offensive and uncomfortable environment," that the hiring process was not "fair and just," and asking that his application be "reviewed and reevaluated." On December 16, 2015, Richardson received an email from Rosemarie Nolan, Executive Director of the Merit Board, stating that the letter would be "forwarded to the Cook County Sheriff's Bureau of Human Resources" and that additional questions should be directed to Robert Egan, CCSO's Compliance Officer. Richardson's complaint was to no avail. At best, he spoke to Mr. Egan, who told him that the CCSO had done nothing improper.

53.     If the CCSO had not disqualified Richardson, the first class of correctional officers that the CCSO hired of which he could have been a member was hired on January 25, 2016.

54.     On January 19, 2016, Richardson filed a class action charge of discrimination with the EEOC, alleging race discrimination in the hiring process for Cook County Correctional Officers. He subsequently received notification of his right to file this case and has done so within 90 days of his receipt of that notice.

55.     In 2017, after filing the EEOC charge, Richardson reapplied to the Merit Board for the Correctional Officer position. While that application was pending, the CCSO contacted him in reference to the 2015 application and asked whether he still wanted the job, because his application was being "reconsidered." Richardson was hired into the June 2017 training class, graduated in November 2017, and is currently employed as a Correctional Officer in Division 4 of the Jail.

56.     Richardson was at all times fully qualified to work as a Correctional Officer for the CCSO and the County but was denied employment until June 2017 because of Defendants' racially discriminatory hiring practices. His current employment as a Correctional Officer at the Jail demonstrates that Defendants had no legitimate, non-discriminatory reason to reject his employment applications. Instead, he was repeatedly denied employment because of his race.

**Plaintiff Harris**

57.     Plaintiff Jonathan Harris applied to be a Correctional Officer at the Department of Corrections in or around June 2014. He took and passed the written examination, the situation test, the physical fitness test, and a drug test and completed the exhaustive background questionnaire. The investigator assigned to conduct his background check, believed to be Don Jeffries, told him that the CCSO was very "short-staffed" and that he should expect to work a great deal of overtime after he was hired.

58.     On February 10, 2015, the Merit Board certified Harris as eligible for appointment as a Correctional Officer.

16

59.     In March 2015, he took a polygraph test, and after completing the test, the examiner told him that he had done "really well," that he had been "really honest," and that he was in "good shape." At the end of the conversation, he congratulated him and said that he hoped to see him around soon. In fact, a training class was scheduled to start about two weeks later.

60.     On March 20, 2015, despite certification by the Merit Board and the positive comments by the polygraph examiner, the CCSO sent Harris a letter rejecting his employment application.

61.     On or around January 15, 2016, Harris filed a class action charge of discrimination with the EEOC, alleging race discrimination in the hiring process for Cook County Correctional Officers. Although the CCSO "reopened" or "reconsidered" the applications of certain African American applicants after the Plaintiffs filed EEOC charges, they did not offer to hire Harris. Harris has received notification from the EEOC of his right to file this case and has done so within 90 days of his receipt of that notice.

62.     Harris was at all times and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Johnson**

63.     Darius J. Johnson applied to be a Correctional Officer at the Department of Corrections in or around October 2018.  He took and passed the written examination. He was notified by the Merit Board in or around November

17

19, 2018 that his application had been disqualified because he had failed to qualify on the situation test administered by the Merit Board.

64.     Johnson reapplied in early 2019.   He was notified by the Merit Board in 2019 that his application had been disqualified because he had failed to qualify on the written examination administered by the Merit Board.

65.     Johnson was at all times and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Dunner**

66.     Charles Dunner, Jr. applied to be a Correctional Officer at the Department of Corrections in or around late 2016 or early 2017.  He took and passed the written examination, the situation test, the physical fitness test, and completed the exhaustive background questionnaire.

67.     In early July 2017, Dunner contacted the Merit Board to inquire about the delay in his application.  Around July 2017, a background investigator, Sylvester Wilson, contacted Dunner. Investigator Wilson informed Dunner that the delay was because he had provided two different addresses, but other than that, there were no issues with his application. Dunner corrected his address.

68.     Investigator Wilson subsequently told Dunner that during the background check, his named matched with that of his deceased uncle. Dunner informed Investigator Wilson that his uncle had died approximately fifteen years prior when Dunner was 14 or 15 years old.  Investigator Wilson told Dunner that "it

18

seems to me that all Cook County wants to do is hire white boys and it seems like they're not giving black men a chance."

69.     On August 24, 2017, the Merit Board notified Dunner of his rejection.

70.     After being rejected, Dunner emailed the Merit Board to inquire why he was rejected but was not provided with a reason.  He called Investigator Wilson who provided Dunner with a number to call at the Merit Board.  Dunner eventually spoke to two different people at the Merit Board who both said that they do not disclose reasons why applicants get rejected.

71.     Investigator Wilson later called Dunner after his rejection to tell him how disappointed he was that Dunner was rejected.

72.     Dunner emailed the Merit Board again in early 2018 to inquire why he was rejected but was not provided with a reason.

73.     Dunner reapplied two times in early 2018. He was notified by the Merit Board both times that his application had been disqualified because he had failed to qualify on the written examination administered by the Merit Board.

74.     In or around early 2019, Mr. Dunner was hired by the Hazel Crest Police Department.

75.     Dunner was at all times and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Williams-Gray**

76. Elzina Williams-Gray applied to be a Correctional Officer at the Department of Corrections in or around September 2017. She took and passed the written examination and the situation test.

77. During the physical fitness test, Williams-Gray was notified that she did not straighten her arms sufficiently on the bench-press portion of the test and was not permitted to proceed to the running portion of the test. She was notified of her rejection in or around November 2017.

78. Williams-Gray was at all times and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Plaintiff Harrison**

79. Plaintiff Tiffany Harrison applied to be a Correctional Officer at the Department of Corrections twice in 2015.

80. After each application, she took the written examination, on July 27, 2015, and September 14, 2015. Subsequent to each examination, Harrison was notified that her application had been disqualified because she had failed to qualify on the written examination administered by the Merit Board.

81. Harrison was at all times and remains fully qualified to work as a Correctional Officer for the CCSO and the County but has been denied employment because of Defendants' racially discriminatory hiring practices.

**Defendants' Policies and Practices of Racial
Discrimination In Hiring Correctional Officers**

20

82. To be hired as a Cook County Correctional Officer, applicants must (a) apply to the Merit Board, (b) be certified by the Merit Board as "eligible for hire," and (c) receive an offer from the CCSO Bureau of Human Resources.

## A. Merit Board Certification

83. After submitting an application to the Merit Board, each applicant must pass a written examination, a "situation" or "scenario" examination, and a physical fitness test. Applicants who successfully complete each of these steps are fingerprinted, drug tested, and interviewed by a Merit Board investigator. (The investigators are hired by the CCSO and on the County payroll.)

84. Applicants must then submit to a rigorous background investigation, which includes completing a 20-page personal history form, submitting documentation, and being interviewed again by a Merit Board investigator. The investigator then authors a report and the entire file is sent to the Merit Board, which decides whether to "certify" the candidate as "eligible for hire." If the Merit Board denies certification, the applicant is disqualified without further consideration.

85. Each applicant file includes a photograph, the applicant's residence address, and the criminal background check. The photographs reveal each applicant's appearance. The background check discloses the applicant's race. In addition, due to Chicago's extreme racial segregation,

(https://www.metroplanning.org/uploads/cms/documents/cost-of-segregation.pdf),

the residence address may strongly correlate with race, and conjure stereotypes about individuals who reside in minority communities with high crime rates.

86.     Applicants are not permitted to appear before the Merit Board. Merit Board members review the files, which include multiple indicia of the applicant's race. Before an applicant moves forward, a majority of the Merit Board members must agree.

87.     Nearly all Merit Board members are white. During most of the relevant period, Byron Brazier was the only African American member of the Merit Board. Once a majority of Merit Board members have voted for or against an applicant, remaining Board members do not review the file. On information and belief, Reverend Brazier did not review all files. Thus, the Merit Board reviewed—and rejected—the applications of many class members without the input of even one African American member.

88.     The Merit Board review process invites racial stereotyping and discrimination. There are few if any objective or standardized criteria.

89.     During the EEOC investigation of Plaintiffs' discrimination charges, the investigator asked the Merit Board and the CCSO to provide data on the racial composition of the applicant pool. They did not provide it, even though the information is readily ascertainable from data collected electronically when persons apply and when they take the first written test.

90.     From 2013 to 2017, a disproportionate percentage of African American applicants "washed out" during the Merit Board certification process. In other

words, the percentage of African Americans applying to be Correctional Officers was higher than the percentage certified by the Merit Board.

**91.** On information and belief, the Merit Board has also intentionally discriminated against Plaintiffs on the basis of race.

## B. Hiring Decisions by the CCSO Bureau of Human Resources

**92.** Applicants are not guaranteed hire after Merit Board certification. The Merit Board sends certified applications to the CCSO Bureau of Human Resources, which makes the final hiring decisions.

**93.** Before final review by the Bureau of Human Resources, applicants are subjected to a polygraph examination.

**94.** During the relevant period, at least one CCSO polygraph examiner expressed racial bias towards African Americans. Examples include insisting that Plaintiff Richardson "must have" sold drugs and "must have" joined a gang because he grew up in the Robert Taylor Homes and asking Plaintiff Simpson, who denied any gang affiliation and said that his father was a Correctional Officer, which gang he would "pick."

**95.** The CCSO's review process is not "color blind." The race of each applicant is clearly indicated. The files include a photograph and other indicia of race, including residence address.

**96.** The CCSO's hiring criteria are unreliable and subjective. The process invites racial stereotyping and discrimination.

97.     The Bureau of Human Resources selection process has an adverse impact on African Americans. African American applicants "wash out" at a higher rate than white applicants.

98.     On information and belief, the CCSO Bureau of Human Resources also intentionally discriminated against Plaintiffs on the basis of race.

### C. Preference for Ward 19 Applicants

99.     The current sheriff, Thomas Dart, and his predecessor, Mike Sheahan, served as sheriff of Cook County continuously for the past 31 years. Both of them have lived in Chicago's 19th Ward, located in Chicago's southwest side, while serving as sheriff.

100.     The 19th Ward has a higher concentration of white residents and a lower percentage of African-American residents than does the City as a whole. According to the 2010 Census, 67% of the residents of the ward are non-Hispanic white persons, while 26% are African-American.  According to the same census, 45% of the residents of Chicago are white while 33% are black.

101.     The 19th Ward contained 51,525 residents in 2010, which was less than 2% of the Chicago's population of nearly 2,700,000. Yet an analysis published in 2011 found that almost 10% of the CCSO workforce came from the 19th Ward.

102.     This overrepresentation of 19th Ward residents in the CCSO workforce evidenced a preference for persons from the 19th Ward in the hiring decisions of the Defendants in the years prior to 2011. Upon information and belief, that preference has continued, if not strengthened, since 2011. And because African Americans are

underrepresented in the population of the 19th Ward compared to their presence in the City as a whole, the preference for applicants from the 19th Ward has the impact of exacerbating the discrimination that exists for other reasons.

103.    Indeed, upon information and belief, the preference exhibited by the Defendants is not for all residents of the 19th Ward, but specifically for white residents of the 19th Ward. This pattern or practice of intentional discrimination makes it much more difficult for African-American applicants to gain employment.

## D. The Discriminatory Results of the CCSO's Hiring Process

104.    The CCSO has hired more than five hundred Correctional Officers since 2014. Despite the racial diversity of the applicant pool, the vast majority of the new hires are either white or Hispanic.

105.    During the period 2014 to 2017, African Americans were substantially underrepresented in every Correctional Officer training class.

106.    According to data provided to the EEOC during its investigation of Plaintiffs' discrimination charges:

    a.    Of 47 new hires in the November 16, 2015 Correctional Officer class, only four were African American—a rate of just 8.5%.

    b.    Of 52 new hires in the January 25, 2016 Correctional Officer class, only seven were African American—a rate of just 13.5%.

    c.    Of 39 new hires in the April 18, 2016 Correctional Officer class, only five were African American—a rate of just 12.8%.

In addition, of the 251 "protective service" employees hired between July 1, 2014 and June 30, 2015 – most or all of whom were Correctional Officers – only 32, or 12.7%, were African American.

107.    Named Plaintiffs and class members observed that African Americans made up as many as 60 to 70% of those present for physical fitness testing. And as of June 30, 2015, 49.4% of the 3,176 experienced protective services employees – the great majority of whom were Correctional Officers – were African American. These percentages reflect that African Americans were qualified for Correctional Officer positions in percentages similar to their presence in the pool of persons taking physical fitness testing during the class period.

108.    The selection rate of African Americans was far lower—much less than 80%—of the selection rate of white applicants for the 2014 to 2018 Correctional Officer classes. Defendants' hiring practices had an adverse impact on African American applicants.

109.    Defendants' selection procedures for the Correctional Officer position create adverse impact, are unreliable, and have never been validated through a demonstration of a demonstrable relationship to job performance, and lesser discriminatory alternatives with the same or greater validity are available. There is no empirical data demonstrating that these procedures are predictive of or significantly correlated with important elements of job performance. This is true of both the Merit Board certification process and the "final review" procedures of the Bureau of Human Resources.

110. The unreliability of Defendants' procedures is demonstrated by the fact that, after three Plaintiffs filed classwide charges of discrimination with the EEOC, Defendants reopened the applications of a number of African American applicants and hired them. These class members, including Plaintiff Richardson, are successfully performing the job duties of a Cook County Correctional Officer, demonstrating that they are fully qualified for the position and were denied employment, not for any legitimate reason, but because they are African American.

111. Alternatively, in the event that Defendants' selection procedures are shown to be job related and consistent with business necessity, less discriminatory alternatives exist that the Defendants have refused to adopt. Such less discriminatory alternatives include, for example:

   a.  "Blind" recruitment procedures designed to eliminate bias.

   b.  Adoption of objective hiring criteria.

   c.  Elimination of racial bias in the personal history questionnaire.

   d.  Racial diversification of the Merit Board.

   e.  Conducting polygraph testing in compliance with the American Polygraph Association Standards of Principles and Practices or, alternatively, eliminating unreliable polygraph testing from the hiring process.

   f.  Anti-bias training for all individuals involved in hiring decisions, including the Merit Board members, Merit Board staff,

27

background investigators, polygraph examiners, and hiring officials in the CCSO Bureau of Human Resources.

**g.** Periodic audits to ensure that African American applicants are not disproportionately eliminated, and remedial action to correct any adverse impact identified.

112. Defendants have also engaged in a pattern or practice of intentional race discrimination that has resulted in the rejection of Plaintiffs.

113. Defendants are well aware that they are hiring only a small number of African Americans as Correctional Officers and that this pattern repeated itself in every training class for five years, from 2013 to 2017. In addition, they are well aware that their subjective and "color coded" hiring procedures are an invitation to discriminate on the basis of race.

114. Plaintiffs and class members have written letters of protest to the Merit Board and the CCSO asking for reconsideration of their rejected applications and complaining about mistreatment during the hiring process. Their complaints have fallen on deaf ears.

115. On December 10, 2015, incumbent African American Correctional Officers met with Robert Egan, the CCSO's Compliance Officer, Undersheriff Zelda Whittler, James P. Roache, Inspector General of the CCSO, and Cook County Commissioner Stanley Moore to complain about racial discrimination against African American applicants and officers. Egan, Whittler, and Roache said they would be "looking into" the issues and would discuss the hiring "numbers" with

Commissioner Moore. Defendants continued to discriminate against African American applicants after this meeting.

**116.** It has been reported to incumbent African American Correctional Officers that, after the Plaintiffs filed discrimination charges with the EEOC, an employee newly assigned to the CCSO's Bureau of Human Resources discovered that the application files of African Americans had been kept apart from others.

**117.** Defendants have also tried to actively conceal the low rate of hiring of African Americans. In October 2015, an incumbent African American Correctional Officer filed a FOIA request for 2013-2015 hiring data. In response, the CCSO created a spreadsheet with the names of what it claimed to be "Blacks" hired from 2013 to 2015. But at least 24 of the individuals on the list are actually white or Hispanic, not African American.

**118.** Defendants' racial discrimination against the Plaintiffs and other Black applicants throughout the liability period has been the result of either express hiring policies or widespread practices so pervasive that they constitute a custom or practice of intentional discrimination.

## CLASS ALLEGATIONS

**119.** Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure. Plaintiffs seek certification of the following four classes:

Class 1: All Black applicants for Correctional Officer positions at the Cook County Jail who took and did not pass the NCJOSI[2] (the first written test) during or after July 2014 and before April 2016.

Class 2: All Black applicants for Correctional Officer positions at the Cook County Jail who took and did not pass the NCJOSI[2] (the first

written test) during or after April 2016.

Class 3:  All Black applicants for Correctional Officer positions at the Cook County Jail who took and passed the NCJOSI[2] (the first written test) during or after July 2014 and then took but did not pass the SBSA-LEO (the second written test).

Class 4:  All Black applicants for Correctional Officer positions at the Cook County Jail who took and passed the NCJOSI[2] (the first written test) during or after July 2014 and then took but did not pass the physical abilities test (PAT).

**120.** Each Plaintiff is a member of the following classes that they seek to represent:

| Class | Class Reps |
|---|---|
| Class 1 (first written test until April 2016) | Simpson, Harrison |
| Class 2 (first written test on or after April 2016) | Simpson, Dunner, Johnson |
| Class 3 ("situation" or second written test) | Johnson |
| Class 4 (physical fitness test) | Williams-Gray |

**121.** The members of each class are so numerous that joinder of all members is impracticable. Between 2014 and 2018 alone, the Merit Board rejected more than one thousand Black applicants because of their scores on the first written test (Classes 1 and 2); more than one hundred Black applicants because of their scores on the second written test (Class 3); and more than three hundred Black applicants because of their performance on the physical fitness test (Class 4). Further, the identity of individual class members is readily ascertainable from Defendants' hiring records.

122.     There are questions of fact and law common to each class, which are both well suited to classwide adjudication and predominate over any questions affecting only individual class members. These common, predominating questions include: (a) whether Defendants' hiring practices disproportionately eliminated African Americans from the Correctional Officer hiring process; (b) whether Defendants' hiring practices that disproportionately eliminated African Americans were job-related and consistent with business necessity; (c) whether less discriminatory alternative procedures existed which Defendants have refused to adopt; and (d) whether there is a basis for municipal liability.

123.     The named Plaintiffs' claims are typical of the claims of other class in that each of them applied and was rejected for employment as a Cook County Correctional Officerbased on the same test subject to the same scoring regime as the other members of the class. Membership in each class is limited to Black applicants rejected at the same step.

124.     Plaintiffs will fairly and adequately represent and protect the interests of each class. They have retained experienced and accomplished counsel who are able and prepared to expend the resources necessary to litigate this case.

125.     A class action is superior to other methods for fairly and efficiently adjudicating this controversy.

126.     Alternatively, classwide liability under the theories advanced in this complaint could properly be certified under Rule 23(c)(4).

### FIRST CLAIM FOR RELIEF
### Title VII — Disparate Impact Claims Against All Defendants

31

**On Behalf of Plaintiffs Merkerson, Simpson, Dunner,
Johnson, Williams-Gray, and Harrison and All Classes
(Cook County Sued for Indemnification Only)**

**127.** Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**128.** In rejecting the employment applications of named Plaintiffs Merkerson, Simpson, Dunner, Johnson, Williams-Gray, and Harrison and the other members of the classes, Defendants Merit Board and Dart have used selection procedures that have a disparate impact on the basis of race and are neither job-related for the Correctional Officer position nor consistent with business necessity. The foregoing conduct constitutes unlawful discrimination in violation of 42 U.S.C. § 2000(e) et seq.

**129.** Defendants have also failed and refused to use available alternative hiring procedures that are valid and less discriminatory.

**SECOND CLAIM FOR RELIEF
Title VII — Disparate Treatment Claims Against All Defendants
On Behalf of All Plaintiffs except for
Plaintiffs Richardson and Harris against the Merit Board
(Cook County Sued for Indemnification Only)**

**130.** Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**131.** Defendant Dart has intentionally discriminated against all Plaintiffs by rejecting their employment applications on the basis of race.

**132.** Defendant Dart's acts and omissions constitute a pattern or practice of racial discrimination against Plaintiffs.

32

133.    Defendant Merit Board has intentionally discriminated against Plaintiffs Merkerson, Simpson, Dunner, Johnson, Williams-Gray, and Harrison by disqualifying them for employment on the basis of race.

134.    The Merit Board's acts and omissions constitute a pattern or practice of racial discrimination by the Merit Board and Dart against Plaintiffs Merkerson, Simpson, Dunner, Johnson, Williams-Gray, and Harrison.

**THIRD CLAIM FOR RELIEF**
**Equal Protection (42 U.S.C. § 1983) Claims Against All Defendants**
**On Behalf of All Plaintiffs except for**
**Plaintiffs Richardson and Harris Against the Merit Board**
**(Cook County Sued for Indemnification Only)**

135.    Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

136.    At all times relevant, Defendants have acted under color of law.

137.    Defendants knew that African American applicants were being disproportionately rejected for employment as Correctional Officers.

138.    Defendants knew that their hiring procedures were subjective, unreliable, and unscientific.

139.    Defendant Dart intended to discriminate against African-American applicants, including all Plaintiffs, on the basis of race.

140.    Defendants Merit Board and Dart intended to discriminate against African-American applicants, including Plaintiffs Merkerson, Simpson, Dunner, Johnson, Williams-Gray, and Harrison, on the basis of race.

141.    In failing to take action to ensure equal employment opportunities for African American applicants, Defendants were deliberately indifferent to the constitutional right to equal protection of those applicants, including Plaintiffs.

142.    As a direct and proximate result of Defendants' deliberate indifference, Plaintiffs have been injured and damaged.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1981 (42 U.S.C. § 1983) Claims Against All Defendants**
**On Behalf of All Plaintiffs except for**
**Plaintiffs Richardson and Harris Against the Merit Board**
**(Cook County Sued for Indemnification Only)**

143.    Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

144.    At all times relevant, Defendants have acted under color of law.

145.    Defendants knew that African American applicants were being disproportionately rejected for employment as Correctional Officers.

146.    Defendants knew that their hiring procedures were subjective, unreliable, and unscientific.

147.    Defendant Dart intended to discriminate against all African-American applicants, including Plaintiffs, on the basis of race in the making of an employment contract.

148.    Defendant Merit Board intended to discriminate against African-American applicants, including Plaintiffs Merkerson, Simpson, Dunner, Johnson,

Williams-Gray and Harrison, on the basis of race in the making of an employment contract.

149.    In failing to take action to ensure equal employment opportunities for African American applicants, Defendants were deliberately indifferent to their statutory right under Section 1981 of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, to be free from racial discrimination in the making and enforcement of an employment contract.

150.    As a direct and proximate result of Defendants' deliberate indifference, Plaintiffs and other class members have been injured and damaged.

**FIFTH CLAIM FOR RELIEF**
**Illinois Civil Rights Act, 740 ILCS 23/5, Claims Against All Defendants on Behalf of All Plaintiffs and All Classes**
**Except for Plaintiffs Richardson and Harris Against the Merit Board**
**(Cook County Sued for Indemnification Only)**

151.    Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

152.    As a direct and proximate result of the conduct described above, Defendants violated the Illinois Civil Rights Act of 2003, 740 ILCS 23/5, under both disparate treatment and disparate impact theories.

153.    As a direct and proximate result of the violations alleged above, Plaintiffs and all class members have been injured by Defendants' practices giving rise to the disparate impact claims, except that Plaintiffs Richardson and Harris have not been injured by the Merit Board's practices.

**154.** As a direct and proximate result of the violations alleged above, Plaintiffs have been injured and damaged by Defendants' disparate treatment of Black applicants, except that Plaintiffs Richardson and Harris have not been injured by the Merit Board's disparate treatment.

## INDEMNIFICATION
### (Against Cook County Only)

**155.** Plaintiffs repeat and re-allege all previous paragraphs of this complaint.

**156.** Because the CCSO and Merit Board are funded by the County, Cook County is responsible to indemnify Dart and the Merit Board against damages, including attorney's fees, recovered from them by Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class pray that this Court:

A. Certify the four proposed classes to litigate the claims in this complaint for class-wide adjudication under Federal Rule of Civil Procedure 23(b)(3) and/or (c)(4);

B. Appoint Plaintiffs' Counsel as Class counsel for the four classes pursuant to Rule 23(g)(1);

C. Declare that Defendants have engaged in practices that deprive the Plaintiffs who are class representatives and other class members of rights protected by Title VII and the Illinois Civil Rights Act;

D.      Declare that Defendants have engaged in intentional discrimination, including patterns or practices and customs of discrimination, that have deprived Plaintiffs of rights protected by Title VII, Section 1981, the Fourteenth Amendment, and the Illinois Civil Rights Act;

E.      Order injunctive relief against Defendants, including that they adopt and implement policies, procedures, and practices that will ensure equal employment opportunity for African Americans in hiring and eliminate all vestiges of racial discrimination in the hiring process for Correctional Officers;

F.      Appoint an independent monitor to oversee Defendants' adoption and implementation of the required policies, practices, and procedures, and to report to the Court;

G.      Award Plaintiffs and the class members all available legal and equitable relief including instatement, backpay, retroactive seniority, compensatory damages (only for Plaintiffs' claims of intentional discrimination arising out of the Merit Board's final review or the CCSO's review of certified candidates), and frontpay to the extent that instatement for all injured parties is not immediately practicable;

H.      Order Defendants to pay Plaintiffs' reasonable attorney's fees and expenses, including expert costs; and

I.      Order all other appropriate relief as the interests of justice may require.

**JURY DEMAND**

37

Plaintiffs request a jury trial for all claims that may be tried to a jury.


Dated:  February 7, 2022

Respectfully submitted,

/s/  Michael Lieder
*One of the attorneys for Plaintiffs*

Marni Willenson
marni@willensonlaw.com
WILLENSON LAW, LLC
3420 W. Armitage Ave., Ste. 200
Chicago, IL 60647
P:312.508.5380
F:312.508.5382

Cyrus Mehri
CMehri@findjustice.com
Michael Lieder
MLieder@findjustice.com
Joshua Karsh
jkarsh@findjustice.com
MEHRI & SKALET, PLLC
1250 Connecticut Ave., NW, Ste. 300
Washington, D.C. 20036
202.822.5100

Attorneys for Plaintiffs

Matthew J. Piers
mpiers@hsplegal.com
Caryn C. Lederer
clederer@hsplegal.com
Justin Tresnowski
Jtresnowksi@hsplegal.com
Margaret Truesdale
mtruesdale@hsplegal.com
HUGHES SOCOL PIERS RESNICK & DYM,
LTD.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
312.580.0100

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 7, 2022, I caused a copy of the foregoing document to be served via the electronic case file system upon counsel of record for all parties.

<u>/s/  Michael Lieder</u>
*One of the attorneys for Plaintiffs*